**D. C. FEDERATION OF CIVIC ASSO-CIATIONS, Inc., et al., Plaintiffs,**

**v.**

**John A. VOLPE et al., Defendants.**

**Civ. A. No. 2821–69.**

United States District Court,
District of Columbia.

Aug. 3, 1970.

Roberts B. Owen and Gerald P. Norton, Washington, D. C., for plaintiffs.

Thomas L. McKevitt, Atty., Dept. of Justice, Joseph M. Hannon, Asst. U. S. Atty., Shiro Kashiwa, Asst. Atty. Gen., and Thomas A. Flannery, U. S. Atty., Washington, D. C., for federal defendants.

John R. Hess and Thomas C. Bell, Asst. Corp. Counsel for the District of Columbia, Hubert B. Pair, Acting Corp. Counsel, and John A. Earnest, Asst. Corp. Counsel, for District defendants.

## OPINION

SIRICA, District Judge.

In this action several citizens associations and individual citizens and property owners of the District of Columbia challenge the procedures employed by the District of Columbia and the Department of Transportation in the planning and the commencement of construction of the Three Sisters Bridge project.[1]

The Bridge from the Spout Run area of Virginia to the District of Columbia upstream from Key Bridge is presently in the preliminary stages of construction as part of the Interstate Highway System and is designated as part of route I-266. The Interstate Highway System was created by the Congress to provide a plan of federal-state cooperation in the construction of highways so as to insure "the prompt and early completion of the National System of Interstate and Defense Highways."[2] The statute provides that the federal government shall bear 90% of the total cost of any interstate project with the state involved paying the remaining 10%.[3] The routes of the system are first selected by the state involved (for the purposes of the Act the District of Columbia is designated a state), subject to the approval of the Secretary of Transportation.[4] But the statute is very clear that no federal payment will be made unless the project is designated as part of the Interstate System with the approval of the Secretary.[5] Title 23 of the United States Code establishes a series of requirements which govern the planning and construction of all Interstate Highway projects. The plaintiffs allege in their complaint that the actions of the District of Columbia and the federal government in going forward with this project violate certain provisions of Title 23 of the United States Code, Title 7 of the District of Columbia Code and various other statutory provisions.

The advisability of this project has been a matter of long standing controversy in this community, and a brief summary of the background of this controversy is helpful in setting the present stage of this litigation in its proper context. During the 1950's and early 1960's several studies of the need for another Central Potomac crossing and the possible alternative types and locations of such a crossing were made. The crossing was first designated a part of the Interstate System in 1960. After holding public hearings on the proposed crossing in 1964, the District of Columbia, with the approval of the federal government, proceeded with the planning for the bridge project in 1966 and 1967. At that time suit was brought by several of the same plaintiffs who appear in this action to enjoin the construction of the bridge and several other freeway projects in the District of Columbia. The Court of Appeals, in a decision dated February 15, 1968, reversed the decision of Judge Holtzoff of this Court, and held that

---

1. In their complaint, the plaintiffs defined the scope of the "project" that they are challenging to be not only the bridge structure from shore to shore, but also "related highways and highway structures." The defendants at several junctures in the trial argued that the issue before the Court was limited to the bridge itself from shore to shore. The Court rejects this argument. A reasonable definition of the project challenged in this case must include not only the shore to shore span, but also the ramps and interchanges which will move traffic from the bridge to other highways or streets. Both Secretary Volpe (Tr. 736–37) and Federal Highway Administrator Turner (Tr. 975–76) testified that the ramps and interchanges must be considered part of the bridge project.

2. 23 U.S.C. § 101(b) (1964).

3. 23 U.S.C. § 120(c) (1964).

4. 23 U.S.C. § 103(d) (1964).

5. 23 U.S.C. § 103(e) (1964).

the construction of the projects should be enjoined on the ground that the District of Columbia was proceeding without complying with the procedural requirements of Title 7 of the D.C. Code.[6] Soon thereafter in August, 1968, Congress enacted Section 23 of the Federal-Aid Highway Act of 1968,[7] the pertinent part of which provides as follows:

(a) Notwithstanding any other provision of law or any court decision or administrative action to the contrary, the Secretary of Transportation and the Government of the District of Columbia shall, * * * construct all routes on the Interstate System * *. Such construction shall be undertaken as soon as possible after the enactment of this Act, except as otherwise provided in this section and shall be carried out in accordance with all applicable provisions of Title 23 of the United States Code.

(b) Not later than 30 days after the date of enactment * * * the government of the District of Columbia shall commence work on the following projects:

(1) Three Sisters Bridge * * *.

(2) Potomac River Freeway * *.

(3) Center Leg of the Inner Loop * * *.

(4) East Leg of the Inner Loop * * *.

This expression of the will of Congress, rather than settling the dispute, served only to exacerbate the controversy. President Johnson, at the time he signed the legislation indicated that he opposed Section 23, but was signing the bill upon the advice of his advisors that prior to construction, compliance with all of the procedural prerequisites would be required.[8] President Johnson also directed at that time that a comprehensive transportation plan be developed for the District of Columbia. In December, 1968, the National Capital Planning Commission (NCPC), the official planning body for the District of Columbia, adopted a comprehensive transportation plan which did not include the Three Sisters Bridge. The District of Columbia City Council approved this NCPC plan, and on January 17, 1969, three days before the new administration was to take office, the bridge was deleted from the Interstate Highway System by the Federal Highway Administrator at the request of the District of Columbia government.

These actions led to what may best be described as the District of Columbia rapid transit-freeway impasse. The Congress, and principally Congressman Natcher, the Chairman of the Subcommittee on the District of Columbia of the House Appropriations Committee, was intent on seeing that the construction mandate in the 1968 Act was carried out. To that end, Congressman Natcher threatened to delete the appropriations for the planned metropolitan area rapid transit system from the District of Columbia budget unless construction and/or planning was commenced in compliance with § 23 of the 1968 Act. The District of Columbia government, on the other hand, was determined that no freeway be constructed in the city other than in accordance with the NCPC comprehensive plan. Soon after entering office, the new Secretary of Transportation, Mr. Volpe, undertook to try to resolve the impasse.

On August 9, 1969, the District of Columbia City Council yielded to mounting pressure from Congress and voted to comply with the 1968 Act, which included going forward with the construction of the Three Sisters Bridge. Secretary Volpe, on August 12, 1969, issued a press release to the effect that he was directing the Federal Highway Administrator to

---

6. D.C. Federation of Civic Associations, Inc. v. Airis, 129 U.S.App.D.C. 125, 391 F.2d 478 (1968).

7. Pub.L. No. 90–495, 82 Stat. 815 (1968) [hereinafter referred to as the 1968 Act].

8. See Statement of President Johnson, August 23, 1968, 114 Cong.Rec. 30958–30959 (1968).

rescind the prior deletion of the bridge from the Interstate System. On August 13, 1969, the project was redesignated as part of the Interstate System by the Federal Highway Administrator. In September, 1969, the District of Columbia advertised for bids for the construction of the piers for the bridge, awarded a contract, and work on the project was commenced. Also in September, 1969, Congressman Natcher agreed to the release of the rapid transit appropriations.

This suit was filed on October 3, 1969. The plaintiffs sought a preliminary injunction against any further work on the project until the District of Columbia government and the Department of Transportation had complied with the provisions of Title 23 of the United States Code, Title 7 of the District of Columbia Code, and various other statutes. After a hearing, this Court denied the request for a preliminary injunction. An appeal was taken, but by an order dated October 31, 1969, the Court of Appeals denied the requested relief without prejudice, and remanded the case to this Court for an expedited hearing on the merits. Cross-motions for summary judgment were filed, and this Court on January 12, 1970, after a hearing, granted the motions of the federal and District of Columbia defendants.[9] This Court interpreted § 23 of the 1968 Act as a directive from Congress that the enumerated projects should go forward as soon as possible without the need to comply with the normal planning and procedural pre-requisites for Interstate Highway projects.

The Court of Appeals, in an opinion dated April 6, 1970, reversed this ruling.[10] The panel majority disagreed with this Court's statutory interpretation. They held that it was not the intent of Congress to exempt the bridge and the other projects enumerated in the 1968 Act from the hearing and planning requirements of Title 23 of the United States Code. Their decision was based on the language of the 1968 Act that "construction * * * be carried out in accordance with all applicable provisions of Title 23 of the United States Code" and their interpretation of the legislative history as indicating that "construction" includes the planning phases of the projects. The holding of the Court is stated succinctly:

> We hold that Section 23 requires that both the planning and the building of the Three Sisters Bridge comply with all applicable provisions of Title 23. Since the District Court ruled otherwise, we remand the case to the District Court for an expedited evidentiary hearing to determine whether appellees have in fact complied with the provisions of Title 23.[11]

This Court has held the expedited evidentiary hearing called for by the Court of Appeals. The trial consumed over ten trial days, and produced a record of over 1,500 pages of transcript and more than 100 exhibits. Among the witnesses called were Secretary of Transportation Volpe,[12] Federal Highway Administra-

9. D.C. Federation of Civic Associations, Inc. v. Volpe, No. 23,870 (D.C.Cir., 1970).

10. D.C. Federation of Civic Associations, Inc. v. Volpe, —— F.2d —— (D.C.Cir., April 6, 1970) (MacKinnon, J., dissenting).

11. Id., Slip op. at p. 22.

12. The testimony of a cabinet officer was necessary in this case because of the somewhat unique circumstances surrounding the approval of the Three Sisters Bridge project by the Department of Transportation. The Secretary was personally involved in the attempts to solve

the rapid transit-freeway impasse which preceded the August, 1969 approval of the project. Several of the decisions required by Title 23 were made personally by the Secretary for this project. Since some of these decisions were not committed to writing at the time they were made, it was only by allowing the questioning of the Secretary himself that the Court could ascertain whether the decisions were in fact made and what constituted the basis for the decisions.

The Court is aware that the Supreme Court in United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed.

tor Turner, and District of Columbia Highway Department Director Airis. Relying on the Court of Appeals decision, this Court limited the scope of the remand hearing to the question of compliance with the applicable provisions of Title 23,[13] and did not consider the alleged noncompliance with other statutory provisions raised in the complaint.[14]

A preliminary question is the scope of this Court's power of review of the actions of the District of Columbia and federal officials which are challenged in this action. As a general rule, a presumption of regularity attaches to the actions of public officials taken within the scope of their authority. United States v. Chemical Foundation, Inc., 272 U.S. 1, 47 S.Ct. 1, 71 L.Ed. 131 (1926). When a statute authorizes an administrative official to make certain discretionary determinations, the scope of judicial review is unquestionably limited. It is not the function of the Court to substitute its judgment for that of the administrative official. Rather the Court must review the administrative determinations merely to insure that the public official has neither exceeded his authority nor has acted in a clearly erroneous manner. United States v. Shimer, 367 U.S. 374, 381–382, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961).

■ The Court feels, however, that actions taken to comply with Title 23 of the U. S. Code are not immunized from judicial review.[15] Rather the Court believes that the proper standard for review is set out in § 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706 (1964), which provides that a reviewing court has the authority to:

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
>> (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

This standard has been applied in at least two cases involving challenges to Inter-

---

1429 (1941), prohibited the probing of the mental process of an administrative decision maker to determine his reasoning in reaching a decision. The interrogation of Secretary Volpe here was limited to the actions which he took, and the materials which he considered as the basis for his determination, rather than his mental process in considering these materials. The *Morgan* holding, *supra,* has been narrowly construed to permit such questioning. *See* Virgo Corp. v. Paiewonsky, 39 F.R.D. 9 (D.V.I. 1966); Union Savings Bank v. Saxon, 209 F.Supp. 319 (D.D.C.1962); cf. Singer Sewing Machine Co. v. NLRB, 329 F.2d 200 (4th Cir. 1964).

In retrospect, the Court feels that its decision to require the Secretary to testify was a wise one. Mr. Volpe testified for over five hours concerning his role in the approval of the Three Sisters Bridge and the relation between the approval of the project and the restoration of the rapid transit appropriations. The Secretary impressed the Court as a sincere and dedicated public servant with many years of experience, and his honest, straightforward testimony did much to elucidate the complex chain of events leading up to the August, 1969 approval of this project.

13. The complaint in this action alleges noncompliance with the following sections of 23 U.S.C.: 102, 103, 128(a) and the Department of Transportation Policy and Procedure Memorandum (PPM) 20–8 implementing this section [23 C.F.R. Part 1, Appendix A (1970)], 134, 138 and 317. In addition, plaintiffs moved at the commencement of trial to amend their complaint to add 23 U.S.C. § 109 (a), and this motion was granted.

14. These include various sections of Title 7 of the District of Columbia Code as well as the following provisions of the United States Code: 16 U.S.C. §§ 1 and 470; 33 U.S.C. §§ 401, 403 and 525; and 49 U.S.C. § 1655.

15. The recent cases limit the range of determinations which are committed to the unreviewable discretion of administrative officials. *See e. g.,* Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Medical Committee for Human Rights v. SEC, 432 F.2d 659 (D.C.Cir., 1970); Overseas Media Corp. v. McNamara, 128 U.S.App.D.C. 48, 56–58, 385 F.2d 308, 316–318 (1967). *See generally* Berger, Administrative Arbitrariness, A Synthesis, 78 L.J. 965 (1969); Jaffe, Judicial Control of Administrative Action 375 (1965).

state Highway projects. Citizens to Preserve Overton Park v. Volpe, 309 F.Supp. 1189, 1194 (W.D.Tenn.1970); Road Review League, Town of Bedford v. Boyd, 270 F.Supp. 650 (S.D.N.Y.1967).

It should be emphasized that the question before this Court is a limited one, i. e., have the District of Columbia and the Department of Transportation complied with the applicable provisions of Title 23? It is not for this Court, or for any Court to decide whether a bridge across the Potomac in the vicinity of the Three Sisters Islands is needed, or if the bridge as presently planned is a worthwhile project which will be for the benefit or to the detriment of the local community. The policy considerations of whether to build this bridge or any of the disputed segments of the Interstate System in the District of Columbia have been aired over and over again through the years. They are not before this Court at this time. Congress in the 1968 Act has settled the question with its command that the bridge should be built. The issues before this Court are (1) whether the responsible officials of the District of Columbia and the Department of Transportation have made the determinations required of them by Title 23, and (2) whether those determinations were made rationally on the basis of the merits of the project and are supported by factual basis.

## THE ALLEGATIONS OF POLITICAL PRESSURE

Before proceeding with a section by section analysis of the question of whether there has been compliance with Title 23, the Court feels that it is appropriate at this time to comment on the issue of the alleged effect of political pressure on the federal and District officials which has been raised in this case. There is no question that the proposed freeway system for the District of Columbia has spawned a fierce and emotional political controversy, with strong feeling on the part of both the anti-freeway and pro-freeway factions. The action of the Congress in the 1968 Act in decreeing that certain projects be built was an extraordinary one in view of the declaration of policy in 23 U.S.C. § 103 (d) that projects for inclusion in the Interstate System should originate with the state involved. The impasse which resulted in the spring and summer of 1969 when the District of Columbia City Council refused to seek reinstatement of the projects to the Interstate System was viewed by many as a test of the will of the local government to stand up to those members of Congress who control the destiny of the city on the one hand, and the will of Congress to impose its mandates on the city irrespective of the wishes of the local governing body on the other.

There is no question that the evidence indicates that strong political pressure was applied by certain members of Congress in order to secure approval of the bridge project. Congressman Natcher stated publicly and made no secret of the fact that he would do everything that he could to withhold Congressional appropriations for the District of Columbia rapid transit system, the need for which is universally recognized in the Washington metropolitan area, until the District complied with the 1968 Act. On July 9, 1969, the House of Representatives passed the conference version of the supplemental appropriations bill for the District of Columbia which did not include the rapid transit funds.[16] Congressman Natcher at that time made his position perfectly clear, stating that "as soon as the freeway program gets under way beyond recall then we will come back to the House and recommend that construction funds for rapid transit be approved."[17] Congressman Broyhill also threatened at that time to withhold other appropriations for the Disrict unless the freeway program went forward.[18] Subsequently, on August 8, 1969, the Dis-

---

16. 115 Cong.Rec.H 5743 (daily ed. July 9, 1969).

17. *Id.* at p. 5737.

18. *Id.* at p. 5738.

trict of Columbia revenue bill was reported to the House with an amendment which would " 'freeze' the apropriation of any part of the authorized Federal payment to the District of Columbia, until the President has reported to the Congress that the city had commited itself irrevocably" to the construction of the freeway system.[19] On August 11, 1969, Congressman Natcher stated that the rapid transit funds would be released "when the President of the United States has reported to the Congress that the District of Columbia has begun work on each of the projects" included in § 23 of the 1968 Act.[20]

The House of Representatives was not alone in its concern for a prompt resolution of the freeway-rapid transit impasse. On July 22, 1969, the members of the Senate Committee on the District of Columbia sent a joint letter to the members of the City Council urging that they act to resolve the impasse and thereby insure that the rapid transit system would be built.[21] On April 28, 1969, the President sent a message to Congress in which he stated in part as follows:

> The impasse which has arisen between the proponents of road and rail transportation in the Washington Metropolitan area has contributed little to the progress of either. There are, however, signs that a fair and effective settlement of these issues will be reached in the near future.[22]

The issue in this case is whether there has been compliance with Title 23 of the United States Code for the Three Sisters Bridge project. Therefore, the pressure exerted by members of Congress is relevant only to the extent that it may have caused public officials, who had responsibilities under Title 23 to consider the project on its merits, to disregard those responsibilities. The Court expresses no opinion on the tactics employed by Congressman Natcher and others in support of their position that the bridge should be built. There has been no allegation nor proof that the actions of Mr. Natcher or any other individuals were in any way dishonest, illegal, or unusual under the circumstances or motivated by any factor other than their desire to see the implementation of the provisions of § 23 of the 1968 Act. But if these actions had the effect of causing other officials to disregard obligations imposed on them by statute, then this Court must halt construction of the bridge until those officials have satisfied their statutory obligations.

The plaintiffs contend that the Congressional pressure directly influenced (1) the decision of the District of Columbia City Council to proceed with the Three Sisters Bridge project, (2) the decision of the Department of Transportation to redesignate the bridge as part of the Interstate Highway System, and (3) the decision of the Bureau of Public Roads and the District of Columbia De-

19. H.R.Rep. No. 91–463, 91st Cong., 1st Sess. 21 (1969).

20. 115 Cong.Rec.H 7212 (daily ed. August 11, 1969).

21. The letter stated in part as follows (plaintiffs' exhibit 162):

> We are writing to express our deep concern over the continuing freeway-subway impasse which is undermining any hope of constructing the rapid mass transit system we have worked so long to realize.
>
> Unless construction of the system is begun soon, the financial arrangements agreed to by the Congress and by the area's local jurisdictions will collapse under the weight of rapidly inflating construction costs. And, as you know, construction cannot begin until the House District Subcommittee appropriates some part of the District of Columbia share in the cost of the system.
>
> * * * * *
>
> Despite our mutual frustration, there is no time left for beating the air or for unrealistic posturing. The question is not whether we have freeways or subways, but whether we will ever have a rapid transit system at all.
>
> We urge the Council to exercise the utmost flexibility to avoid the disaster which further delay in this matter portends.

22. 115 Cong.Rec. 10520 (1969).

partment of Highways and Traffic to accelerate the schedule for the commencement of the construction on the project.

The principal focus of the Congressional pressure was the District of Columbia City Council, whose vote in December, 1968, had led to the deletion of the bridge from the Interstate System. The action of the Council on August 9, 1969, approving the Three Sisters Bridge was the direct result of this pressure. At the time that the Council voted by a margin of six to two to approve the bridge, three of the members who voted in favor of the project issued statements that they were doing so, not because of their conviction that the bridge was necessary or that it would be beneficial to the local community, but as a direct result of the Congressional pressure and threats to delete or withhold appropriations for the rapid transit system.[23] If the City Council had not yielded to this pressure and approved the bridge project, it would not have been redesignated as part of the Interstate System, since it was in response to the request of the District of Columbia that the redesignation was made. The Council, however, was acting as a legislative body in this instance, and the application of pressure by one legislative body, in this case Congress, on such a body is not unusual. Therefore, the fact that the Council action in approving the bridge was a direct result of the Congressional pressure and threats regarding the rapid transit appropriations does not, in and of itself, mean that there has been noncompliance with Title 23.

A more serious allegation by the plaintiffs is that Secretary of Transportation Volpe, in directing the Federal Highway Administrator to redesignate the bridge as part of the Interstate System, did not base his decision solely on the basis of the merits of the project, but was acting in response to the Congressional pressure regarding the rapid transit appropriations. There is no question that the Secretary was aware of the nature of the impasse between the Congress and the City Council. He testified that soon after taking office, he undertook to try to resolve the problem. (Tr. 668). In June, 1969, when the supplemental appropriations bill for the District was pending, the Secretary was hopeful that the Senate version would be approved and that the funds for the rapid transit system would be included. (Tr. 675). On June 25, 1969, after the City had agreed to go forward with several freeway projects other than the Three Sisters Bridge, the Secretary issued a statement that he was hopeful that this action would help bring about the release of the rapid transit appropriations. (Plaintiffs' exhibit 78). Mr. Volpe also recalled that he was aware of the threat to withhold the entire federal payment for the District unless affirmative action was taken on the freeway program. (Tr. 692–93). The statement issued by the Secretary at the time he directed the Federal Highway Administrator to restore the bridge to the Interstate System indicates that the pressure on the rapid transit funds was a consideration

23. Plaintiffs' exhibit 147. For example, Council Chairman Hahn stated:

This City needs and requires a subway system as part of its overall mass transportation system. The people who need the subway the most are those for whom we are most concerned, the low income citizens of our inner city. Unfortunately, this citizen cannot produce the system for himself and he needs the $1.5 Billion which the Congress is prepared to provide as the District's share of the subway system. There is no other way.

The Congress of the United States has said clearly that it will not provide the subway money unless the bridge is started. * * * I believe the building of the bridge is wrong and I am still not convinced that it is in the best interests of the City. * * * We are forced at times to make rather hard choices—either build the bridge or no subway.

See also the statement of Councilman Yeldell that "[p]ainful and pressing political realities indicate that we must yield."

at that time.[24] Also in connection with the decision to go ahead with the bridge project, President Nixon in a letter to Congressman Natcher, dated August 12, 1969, reviewed the actions of the City Council and the Department of Transportation and stated: "I trust that these actions will fulfill the criteria which you set forth in your statement of August 11, 1969." [25]

█ The mere fact that the Secretary was aware of the Congressional pressure to build the Three Sisters Bridge is not sufficient to invalidate his action in directing that the bridge be restored to the Interstate System. Since the issue in this suit is whether there has been compliance with Title 23 of the United States Code, the political pressure exerted by members of Congress is relevant only as to whether it may have caused Secretary Volpe to act without considering the merits of the project as required by Title 23. As will be discussed in connection with § 138, Mr. Volpe commenced an exhaustive study of the merits of the Three Sisters Bridge project soon after taking office, and did not come to a decision that the bridge was essential until the Summer of 1969. The Court believes the Secretary's testimony that his decision was based on the merits of the project and not solely

24. The press release issued by the Secretary on August 12, 1969, included the following statement (plaintiffs' exhibit 81):

It is my conviction that this fairminded and courageous action [of the City Council] * * * and the commitment of the Department of Transportation to complete the projects required by the Federal-Aid Highway Act of 1968, will result in approval by the subcommittee on appropriations for the District of Columbia of the District's share of appropriations for the area's rapid transit system.

25. Plaintiffs' exhibit 82. The President's letter in its entirety stated:

Your diligent efforts through the years to ensure that the District of Columbia will enjoy a balanced transportation system are very much appreciated by all of us who are concerned with the welfare of our Capital City. As you know, I have previously expressed my desire that a fair and effective settlement of the issues involved in the transportation controversy be reached to serve the interests of all those concerned—central city dwellers, suburbanites, shoppers, employees and visitors. It is my conviction that those steps necessary for a fair and effective settlement have been taken.

The City Council of the District of Columbia has now voted in favor of a resolution to complete the requirements of the Federal Aid Highway Act of 1968. Immediately thereafter, the Commissioner of the District of Columbia directed the Department of Highways to implement immediately the requirements of the Act. The Secretary of Transportation has directed the Federal Highway Administrator to rescind the letter of his predecessor dated January 17, 1969, thus placing these projects back into the Interstate System. Furthermore, the Federal Highway Administrator has been directed to work closely with the Highway Department of the District of Columbia in order to continue work until completion of all projects and the study called for in the Federal Aid Highway Act of 1968. I trust that these actions will fulfill the criteria which you set forth in your statement of August 11, 1969.

The District of Columbia Government is firmly committed to completion of these projects as the Federal Aid Highway Act of 1968 provides. I join the District of Columbia Government in that commitment, and I have directed the Attorney General and the Secretary of Transportation to provide assistance to the Corporation Counsel of the District of Columbia to vigorously defend any lawsuits which may be filed to thwart the continuation of the projects called for by the Act.

A balanced transportation system is essential for the proper growth and development of the District of Columbia. I hope that this evidence of tangible progress would permit us to assure the citizens of the District of Columbia that your subcommittee will be in a position to approve the $18,737,000 deleted from the Supplemental Appropriation bill together with the $21,586,000 in the Regular Appropriation bill for the District of Columbia Fiscal year 1970.

on extraneous political pressures.[26] It is true that Mr. Volpe was also interested in securing the release of the rapid transit appropriations, and that the approval of the bridge led to the release of those funds. But the Court finds that the mere fact that the Secretary was aware of this pressure does not invalidate his decision that the Three Sisters Bridge is an important and necessary part of the Interstate Highway System.

The plaintiffs contend that the present situation falls within the rule set forth in Jarrott v. Scrivener, 225 F.Supp. 827 (D.D.C.1964). In that case a group of citizens challenged the action of the District of Columbia Board of Zoning Adjustment in approving an exception to the zoning regulations for the construction of a new Soviet embassy in a residential area of Northwest Washington on the grounds that certain members of the Board had been subject to secret contacts from high government officials who favored the grant of the exception. Judge Pine ruled that these off the record contacts amounted to a denial of the plaintiffs' rights to a fair and impartial hearing before the Board. The Court did not find that there was any intentional wrongdoing on the part of either the Board members or the officials who contacted them. All that was necessary to invalidate the actions of the Board was that the significant *ex parte* contacts were made with the intent of influencing the Board's decision and that the contacts "were of such a character that it may reasonably be inferred that they did impair, consciously or unconsciously, [the Board's] independence of judgment." 225 F.Supp. at 834.

The plaintiffs contend that the Congressional pressure for the construction of the Three Sisters Bridge was of such a character that it can reasonably be inferred that it had some influence, conscious or unconscious, on the decision of the Secretary to redesignate the bridge as part of the Interstate System. From the evidence of the contemporaneous statements of Secretary Volpe and his testimony in this case, there is no question that the pressure regarding the rapid transit appropriations was given some consideration at the time of the approval of the project in August, 1969. But the Court concludes that this does not invalidate the decision of the Secretary in this case. The situation here is distinguishable from that in the *Jarrott* case. The Court there emphasized that

---

26. See Tr. 816, 818:

[Mr. McKevitt] Thank you, Mr. Secretary. Was your decision to place the Three Sisters Bridge back on the system and your decision under 4–F or 138 U.S.C., Title 23, based upon any political pressure?

[Secretary Volpe] I would say that political pressure was not a factor at all in my judgment. I was approached, yes, by Congressmen who wanted the Freeway System built. Some wanted the Three Sisters Bridge built, some did not. I had all kinds of requests, but I had been in Washington before. Many of the members of Congress I knew personally and intimately, and they know I don't bend very easily. They did bring to my attention facts and their hope that I would consider all these facts in the judgment that I made as to whether or not the Three Sisters Bridge would be included or re-included in the Inter-state System. And it was on the basis of all the facts, as I brought them together in the 4–F areas that I have spoken about that I made my final decision.

\* \* \* \* \*

[Mr. Owen] Mr. Secretary, Mr. McKevitt asked you about political pressure. In the summer, July and August of 1969, it was your hope, was it not, that the Congress would release the Subway funds?

[Secretary Volpe] Of course. Yes.

[Mr. Owen] Did that hope in your mind have any influence at all on your decision to put the Three Sisters Bridge project in the interstate system at all?

[Secretary Volpe] It would have had absolutely no bearing on my decision if I had felt the Three Sisters Bridge was not essentially necessary. I found it was essentially necessary; therefore, that was the reason for my proceeding along the lines I did, hopeful that the Congress would release the funds for the transit system, because I knew that one without the other, in this case, would not have done the job.

the Board of Zoning Adjustment was a quasi-judicial body with an obligation to give all interested parties a fair hearing before reaching its decision. The basis of the decision invalidating the Board's action was that the secret *ex parte* contacts deprived the plaintiffs of their fundamental right to a fair and impartial hearing. In contrast, the Secretary, in approving the redesignation of the Three Sisters Bridge to the Interstate System, was not performing a judicial or quasi-judicial function. The statute commits the decision to the Secretary's discretion. There is no requirement that he base his decision only on matters presented at a public hearing, but rather, there is only the implied requirement that he base his decision on the merits of the project. In view of the Secretary's testimony that he made an exhaustive review of the merits of the project and based his decision on that study, this Court will not invalidate his decision. The present case is further distinguishable from *Jarrott* in that there the contacts with the Board were secret, while here the actions of Congressman Natcher and others are a matter of public record contained in official Congressional documents and speeches made on the floor of the House of Representatives.

Nor does the fact that the Secretary acted in response to the action of the District of Columbia City Council affect the validity of his decision. The plaintiffs argue that since the Congressional pressure on the rapid transit funds was the direct cause of the approval of the bridge by the City Council, and since the Secretary would not have directed the redesignation of the bridge as part of the Interstate System had the City Council not approved the bridge, then it must follow that the Congressional pressure on the rapid transit funds was the direct cause of the redesignation. The Court rejects this argument. Merely because the City Council acted as a result of Congressional pressure and the Secretary would not have acted if the City Council had not acted, this does not mean that the Secretary acted because of Congressional pressure. The Secretary's obligations under Title 23 are entirely separate from any obligations which the City Council might have. The Court's finding that the Secretary acted on the basis of his judgment as to the merits of the bridge project is therefore unaffected by whatever may have been the motivation of the City Council in approving the bridge.

The final alleged effect of the Congressional pressure on the Three Sisters Bridge project is the acceleration of the commencement of construction. The reaction on the part of officials of the Bureau of Public Roads and the District of Columbia Department of Highways and Traffic to the approval of the bridge project was swift. On August 15, 1969, the Bureau of Public Roads Division Engineer for the District of Columbia, Mr. Hall, in a letter to Mr. Airis, the Director of the District highway department, stated that, although he could not approve the Type, Size and Location Report for the bridge which had been submitted by the District because no final determination had yet been made as to the type of superstructure which would be built, he was authorizing the preparation of contract plans for the piers of the bridge "[i]n an effort to initiate early construction of the bridge." (Plaintiffs' exhibit 85). In a letter accompanying the submission of the plans, specifications and estimates for the piers to Mr. Hall on September 2, 1969, an official of the District highway department, Mr. Sawyer, stated that this action was being taken "due to the urgency in getting this project under way." (Plaintiffs' exhibit 89). Mr. Hall noted on the letter that the bidding period was being shortened from three to two weeks "because of the urgency of starting construction at the behest of Congress and the need of DC for WMATA [rapid transit] money." On September 3, 1969, the District invited bids for the pier construction contract. The bids were opened on September 17, 1969, the contract was awarded the following day, and construction was begun later that month. Congressman

Natcher was kept apprized of these developments by Mr. Airis. (Plaintiffs' exhibits 94, 95).

 The above evidence establishes that the construction work on the project was undertaken in great haste in an effort to satisfy Congress that § 23 of the 1968 Act was being complied with by the District of Columbia. The fact that construction was begun on this project faster than normal, however, does not bring this project into noncompliance with any provision of Title 23. The acceleration of the normal schedule is only relevant if, in their haste to appease certain members of Congress, the officials involved failed to carry out the responsibilities imposed on them by Title 23. The Court finds that the actions of the Bureau of Public Roads and District of Columbia officials in accelerating the commencement of construction on the bridge project were reasonable under all of the facts and circumstances of this case. Congress had directed in § 23 of the 1968 Act that the Three Sisters Bridge should be built, and that work on the project should begin within 30 days of the enactment of the statute. Because of the refusal of the City Council to approve the bridge until August, 1969, a year had elapsed since the enactment of the 1968 Act with no progress in carrying out the mandate of Congress. Therefore it was reasonable for the highway officials involved to proceed as fast as possible with the commencement of construction of the project, provided that there was compliance with all applicable provisions of Title 23.

### 23 U.S.C. § 138

#### I

This section provides as follows:

It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park land and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After the effective date of the Federal-Aid Highway Act of 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.[27]

 This section embodies the intent of Congress that whenever possible parklands should not be used for highway projects.[28] It is not, however, an absolute prohibition against the use of such public lands. Rather, the statute makes the use of parklands contingent on the discretionary determination of the Secretary of Transportation that (1) there is no feasible and prudent alternative to the use of such land, and (2) the program includes all possible planning to minimize harm resulting to the parkland from such use.

There is no question that the Three Sisters Bridge project as presently plan-

---

27. This section is identical to section 4 (f) of the Department of Transportation Act [49 U.S.C. § 1653(f) (Supp. V, 1970)].

28. For a more complete discussion of the legislative history of this section, see Citizens to Preserve Overton Park, Inc. v. Volpe, 309 F.Supp. 1189, 1194–1195 (W.D.Tenn.1970).

ned will require the use of some public parkland on both the Virginia and District of Columbia sides of the Potomac. Land on both sides of the river in the vicinity of the planned bridge is currently dedicated to public park use under the jurisdiction of the National Park Service of the Department of Interior. In addition, construction of the bridge will affect the Georgetown Historic District. Therefore § 138 prohibits the approval of the bridge project by the Secretary unless the two criteria set out in the section have been met.

In contrast with the duties imposed upon the Secretary by other provisions of Title 23, the obligations under § 138 have not been delegated to subordinates within the Department of Transportation. The Secretary has reserved for himself the crucial decision required by § 138 for projects involving the use of public parklands. (Tr. 641). It was for this reason that it was necessary that Secretary Volpe be a witness in this case.[29]

The plaintiffs base their position that there has been no compliance with this section on three principal contentions. The first is that the Secretary, prior to approving the redesignation of the Three Sisters Bridge to the Interstate System in August, 1969, made no determination either that there were no feasible and prudent alternatives to the use of the parkland involved or that the program for the bridge included all possible planning to minimize the harmful effects to the parkland.[30] Plaintiffs' second contention is that, assuming the Secretary did make the determination that there is no feasible and prudent alternative to the use of parkland, then this determination was arbitrary and capricious in that

there are, in fact, such feasible and prudent alternatives, and that the Secretary did not consider and rationally reject each of these alternatives. The third argument is that even if the Secretary did make the determination regarding all possible planning, then that determination is also arbitrary and capricious in that there is no factual basis for such a finding.

The major problem confronting this Court in making its determination of whether there has been adequate compliance with § 138 is the lack of any meaningful administrative record within the Department of Transportation evidencing the fact that proper consideration has been given to the requirements of this section. The only contemporaneous written record of Secretary Volpe's determination was a press release issued by the Department of Transportation on August 12, 1969. (Plaintiffs' exhibit 81; Tr. 729–30). This press release, however, makes no mention of any determination under § 138, but merely announces the Secretary's approval of the Three Sisters Bridge project.

Although the testimony at the trial was somewhat contradictory, it appears that the Department of Transportation did not establish definitive procedures for the orderly consideration of § 138 problems until January, 1970. In addition, the evidence indicated that the procedures that had been established at the time of the approval of this project in August, 1969, were not utilized in the consideration of this project. In early 1969, Secretary Volpe created the Office of Environment and Urban Systems, and appointed James Braman as Assistant Secretary to head that office. Mr. Braman testified that, although he was in-

---

29. See n. 12, *supra*.

30. The question has arisen whether § 138 requires that any finding or determination be made by the Secretary. Chief Judge Brown, in Citizens to Preserve Overton Park, Inc. v. Volpe, 309 F.Supp. 1189 (W.D.Tenn.1970), held that the statute does not require the Secretary to publicly articulate any finding on the

§ 138 requirements. 309 F.Supp. at 1194. The section is mandatory, however, in its prohibition of the use of parklands unless the two requirements are met. Therefore, the section requires the Secretary to make at least a mental finding, based on the information known to him, that the two requirements have been met before he can lawfully approve a project.

volved in several projects with § 138 problems immediately upon taking office, no formal procedures for the submission of information to his office and for the preparation of recommendations by his office had been established by August, 1969. (Tr. 1008). Mr. Braman was not involved in any way with the Three Sisters Bridge project, as was usually the case in a project involving parklands. (Tr. 1004, 1012). Similarly Rex Wells, the Chief of the Bureau of Public Roads' Office of Systems and Locations, testified that, while it was normally the responsibility of his office to prepare a recommendation for the Secretary regarding all projects covered by § 138, and that this responsibility had been delegated to his office in June, 1969, no such recommendations had been made prior to August, 1969. (Tr. 277). A third official of the Department of Transportation, Charles Hall, the Division Engineer, with supervisory authority over Interstate Highway projects in the District of Columbia, testified that he departed from the normal procedure in that he did not prepare a § 138 recommendation for

this project. He testified that he was superseded by his superiors, and was not asked to prepare a recommendation in the interest of "speed * * * to get the project started." (Tr. 499–501).

In view of the decision not to follow the normal procedures in the consideration of the § 138 requirements for the Three Sisters Bridge project, and the failure of the Department of Transportation to make a record of the determinations made by the Secretary at the time of his approval of the project in August, 1969,[31] this Court must base its determination of whether there has been compliance with § 138 on the testimony of Secretary Volpe at this trial, taken together with any corroborating circumstances or testimony of other witnesses.

In reviewing the testimony of Secretary Volpe, it must be kept in mind that § 138 clearly commits to the Secretary's discretion the determination that there is no feasible and prudent alternative to the use of the parkland and that the program includes all possible planning to minimize harm to the parkland. This Court is merely reviewing the actions of

31. As noted previously, the only contemporaneous written record of the Secretary's determinations is the press release of August 12, 1969, (plaintiffs' exhibit 81), which is silent as to any consideration of § 138 factors. While it might be argued that a favorable determination of the § 138 issues is inherent in the Secretary's approval of the project, the mere fact that the project has been approved is of no significant probative value as to the question of compliance with § 138.

There was much testimony and argument at the trial about the so-called Holmes Memorandum (plaintiffs' exhibit 98). This document dated October 15, 1969, purports to set forth the grounds for the Secretary's determinations as to the § 138 requirements. It is addressed to Secretary Volpe from E. H. Holmes, Acting Federal Highway Administrator, and the concurrence of the Secretary in the conclusions set forth in the memo is noted with the date of October 15, 1969. Several factors lead this Court to the conclusion that this document is of little or no probative value on the question of compliance with § 138 by

the Secretary. It was prepared in October, 1969, two months after the Secretary's alleged compliance with § 138. It was prepared after the filing of the complaint in this action, which alleged, among other things, that the Secretary had failed to properly make the findings required by § 138. It was prepared by Mr. Wells at the request of Edwin Reis, a lawyer in the Department of Transportation who was actively engaged in the defense of this lawsuit. (Tr. 170, 177, 420–23). On October 16, 1969, one day after the date of the memo, it was filed in this action as an exhibit in opposition to plaintiffs' motion for a preliminary injunction. Both Mr. Reis and Mr. Wells testified that they could not recall another instance in which such an after-the-fact memo had been prepared to represent what had been considered at the time a decision had been made. (Tr. 285, 430). And both Mr. Reis and Mr. Wells testified that they did not know from their personal knowledge if the Secretary had ever made a § 138 determination, (Tr. 163, 424) or if he had, what constituted the basis for the determination. (Tr. 163, 190, 425–26).

the Secretary to determine whether they have a basis in fact, and that they do not amount to an abuse of discretion. The wisdom of the statutory scheme of committing such decisions to administrative officials experienced in the area of their jurisdiction, rather than to courts, is evident in the present situation. Secretary Volpe has a wealth of experience in the planning of projects such as the one involved in this case. He has taken college level courses in planning and has held several positions in public life, including that of Commissioner of Public Works of Massachusetts, Federal Highway Administrator, and Governor of Massachusetts for three terms. (Tr. 813–16). The Court therefore feels that Secretary Volpe's judgment on these matters is entitled to great weight.

■ The first question before the Court is whether the Secretary, prior to approving the redesignation of the Three Sisters Bridge to the Interstate Highway System made the determinations required by § 138, i. e., that there was no feasible and prudent alternative to the use of the parklands involved in the project and that the program included all possible planning to minimize the harmful effects of the project on parkland. Mr. Volpe testified that he did in fact make the required determinations in connection with his decision to approve the bridge project.[32] Although as explained above, no credible written record of this determination was made,[33] this Court believes Mr. Volpe's testimony on this matter. The Secretary impressed the Court with his forthright testimony. The Court is convinced from his testimony and the facts developed at trial that he is an honest, experienced, and dedicated public servant who did make the determinations required of him by § 138 prior to

---

32. See Tr. 712–13:

[Mr. Owen] Directing your attention specifically to the Three Sisters Bridge, you have told us that you put some projects back into the Interstate System on August 12. Did you make any other determination at that time with respect to the Three Sisters Bridge project?

[Secretary Volpe] Yes, Yes, I was doing that for the entire period prior to August 12 and had been studying, as I say—I could assemble and asked our staff to assemble with regard to both statistics on the volume of traffic, the question of environment; and even though there was a difference of opinion, frankly, in our own shop as to whether or not 4(f) applied because of the Congressional Act of 1968, I nevertheless felt that we still should consider it and determined that I should consider it; and on the basis of my own judgment, the judgment of our General Counsel, who concurred, that—shall we say it is better to be safe than be certain that we were completely in accord with all the statutes—not withstanding the fact that the Congressional act was passed.

We reviewed very carefully during those weeks both the traffic estimates, the previous studies, the updated studies, the Department of Interior recommendations which had been made, the National Park Services, and all the other elements that enter into a decision-making process, including listening to comments and suggestions from both those who were opposed as well as those who were for the construction of all or part of the freeway system, including those who were for and against the Three Sisters Bridge.

That all was a part of our decision-making process.

[Mr. Owen] Let me see if I understand you correctly.

Are you saying that you did make a Section 138 or a Section 4(f) determination with respect to the bridge in August of 1969?

[Secretary Volpe] This was approximately the early part of August, as near as I can recall, yes.

[Mr. Owen] Do I understand that that 4(f) decision was made, so to speak, as part of the decision to put the bridge back into the Interstate System?

[Secretary Volpe] It was, yes, a combined judgment that, one, was essential and necessary; and, secondly, did we comply with Section 4(f) or could we comply with Section 4(f) if this was placed back in the System and determined that the answer was yes in both areas.

33. See n. 31, *supra*.

**772**

signifying his approval of the Three Sisters Bridge project.[34]

The Court does not consider the lack of a contemporaneous written record of the § 138 determinations and the failure of the Secretary to utilize the normal decision making channels within the Department of Transportation, such as they were at the time of the decision on this project, fatal to the Secretary's assertion that he made the required determinations. As discussed above, there is no requirement that the Secretary publicly articulate his § 138 determination.[35] Secretary Volpe noted in his testimony that at the time that this project was under consideration the Office of Environment and Urban Systems had not established the procedures for handling § 138 problems which are now in effect. (Tr. 725). The Secretary also pointed out that Assistant Secretary Braman, who headed that office, would not have been as involved in the Three Sisters Bridge project as he would in other projects given § 138 consideration at the same time because of the close personal involvement of the Secretary in this project. (Tr. 808). This appears to the Court to be a reasonable explanation of the procedures followed in this case.

## II

■ Given this finding—that the determinations required by § 138 were made by the Secretary, the next question before the Court is whether the Secretary acted reasonably in reaching his decision that there were no feasible and prudent alternatives to the use of the parklands, i. e., whether the Secretary adequately considered the feasible alternatives to the presently planned project and whether there were in fact feasible and prudent alternatives to the use of the parkland.

Much of Secretary Volpe's testimony was taken up with inquiry as to the considerations which led to his decision that the § 138 requirements had been met. Mr. Volpe became personally involved in the problems of the Interstate Highway System in the District of Columbia soon after assuming office in January, 1969. (Tr. 650). While much of his activity was directed at achieving a settlement of the impasse which had arisen between the City Council and members of Congress, the Secretary emphasized that he conducted a comprehensive review of the merits of the projects involved, including the Three Sisters Bridge. The Secretary stated:

> [E]arlier in the year [1969] I asked that consideration be given to any possible locations whether [a bridge] was needed, as a matter of fact, at all. In other words, I went at this with a completely open mind, and asked that my people consider it on the same basis, not on the basis of judgments they had made two years, four years or five or one year before, but on the basis of the most recent and up-to-date material they could procure. That's the same way I approached it, with a completely open mind; and until I was presented with the kind of data and documents and statistics that were, in my opinion, conclusive as to the need, I did not make up my mind as to whether or not a Three Sisters Bridge should be built. (Tr. 778–79).

Mr. Volpe testified that he considered the § 138 factors throughout his study and evaluation of the bridge project, (Tr. 712) and that he had discussed these factors with several staff members, including the Federal Highway Administrator, the General Counsel of the Department of Transportation, the Undersecretary of Transportation, and his administrative assistant. (Tr. 722). This statement is supported by the testimony of Mr. Turner, the Federal Highway Administrator, that consideration of § 138 requirements was inherent in all discussions of

34. See n. 26, *supra* and accompanying text for a discussion of the effect of the political pressures on Mr. Volpe's actions in approving the bridge project.

35. See n. 30, *supra*, for a discussion of Citizens to Preserve Overton Park, Inc. v. Volpe, 309 F.Supp. 1189 (W.D.Tenn. 1970).

the project, and in fact was "almost a controlling factor" in any action taken on the project. (Tr. 978).

There was much questioning of Secretary Volpe as to the documents, studies, and other materials which he considered and which formed the basis for his § 138 determination that there were no feasible and prudent alternatives to the use of the parklands. The Secretary of Transportation is an extremely busy official with responsibility for thousands of decisions each year, and therefore he could not possibly be expected to remember with any degree of certainty all of the materials and data which formed the basis for any particular decision. Nor could the Secretary be expected to personally study all of the details of each of the documents which are presented to him as the basis for a particular decision. (Tr. 743–44). The Secretary stated at several times during his testimony that he had considered many documents and studies presented to him by his staff as well as the staff summaries of their contents. (Tr. 770, 773–74, 793).[36] In addition, the Secretary consulted with various representatives of the community, who took positions on both sides of the issues of whether the bridge should be built. (Tr. 801–02, 817).

The Court concludes that the Secretary and his staff did make an adequate study of the feasible alternatives to the use of the parkland involved in the project as presently planned. The Secretary testified that the alternatives considered included not building a bridge, building a tunnel, building a bridge at the Three Sisters location, and building a bridge at another location. (Tr. 712–13, 724, 778). As summarized above, the Secretary made an exhaustive personal review of many of the reports and studies which have been prepared over the years on the need for and the possible alternative types of furnishing a new Central Potomac crossing before approving the bridge project. The Court is not prepared to find that the plaintiffs have established that an inadequate study of the possible alternatives was made merely because the Secretary could not recall at his examination in this case, a year after his decision to approve the bridge, whether he had considered certain admittedly relevant studies and reports or that he could not recall details of the contents of certain of these documents.

The Court also concludes that the determination by the Secretary that there is no feasible and prudent alternative to the use of the parklands as presently planned was not an abuse of his discre-

36. A great deal of confusion about the materials which the Secretary considered in preparation for his § 138 determinations has been caused by the Holmes Memorandum. See n. 31, *supra*. The memo states in part:

There have been several studies during the past 20 years of transportation needs of the District of Columbia Metropolitan area, such as a 1953 Virginia study by Wilbur Smith and Associates, the 1959 Transportation Plan-National Capital Region, and the 1961 Plan for the Year 2000. These studies demonstrate that there is a need for an additional Potomac River highway bridge between Key Bridge and Chain Bridge. The three studies named do support the need for a new Central Potomac crossing, but, of course, they are not the only studies on the subject, and there are several other studies which do not recommend the construction of a new crossing.

Many of these other studies are more recent than those enumerated in the memo.

The question arose whether the three studies named were the only materials reviewed by the Secretary before he approved the bridge project. Although some confusion may have arisen at the Secretary's deposition, he made it quite clear at the trial that the Holmes Memorandum is not an inclusive catalogue of the materials which he considered. (Tr. 727). As was pointed out by the Secretary, the language immediately preceding the enumeration of the three studies is "several studies * * * *such as* * * * *." (Tr. 796). It is therefore quite evident that the Secretary in indicating his concurrence with the memo, did not intend to say that the three studies enumerated were the sole basis of his decision.

tion in that it is supported by the record in this case. The crucial requirement of the statute is that the Secretary is called upon to determine that there is no *"prudent"* alternative to the use of the parkland. Thus, while there may be several feasible or possible alternatives to the use of the parkland presently planned to be used for the bridge project, the key decision committed to the discretion of the Secretary is whether, *in his judgment*, any of these possible alternatives is prudent or wise.

In reviewing the Secretary's determination, two factors must be kept in mind. The first is that § 23 of the 1968 Act at the very least expresses the will of Congress that some type of Central Potomac crossing must be built. Therefore the alternative of not building any crossing and thereby not affecting in any way the parkland bordering the river, was foreclosed to the Secretary. The second consideration is that any type of Central Potomac crossing would involve the use of some parkland. Although it may be true that some of the possible alternatives proposed over the years might have a less substantial effect on parkland than the present plan, the fact that the use of some parkland is inevitable in the construction of any crossing is certainly a legitimate factor to be considered in reviewing the § 138 decision.

The Court concludes that the plaintiffs have not sustained their burden of proof that the Secretary's determination that there is no feasible and prudent alternative to the use of the parklands to be used in the presently planned project was arbitrary and capricious. While over the years there have been several studies which urge that no new Central Potomac crossing be built or that it might be built at a location other than that presently planned, there is also substantial evidence of the need for a crossing in the area, and of the advisability of a bridge similar to that presently planned. This Court in the exercise of its limited power of judicial review, cannot state that any of the other proposals, while they may be feasible, would be prudent in that they would better serve the transportation needs of the Washington metropolitan area as well as have a less drastic effect on parklands on the banks of the Potomac.

### III

█ The final question before the Court under § 138 is whether the Secretary's determination that the program for the Three Sisters Bridge included all possible planning to minimize harm to the parklands, was arbitrary and capricious in that it was not supported by the actual status of the planning process for the bridge project.

The plaintiffs advance several arguments to support their contention that Secretary Volpe could not have made a rational determination that the bridge program included all possible planning to minimize harm to the parklands. The first is that no final plans had been developed for the ramps and interchanges for the bridge, which would have a direct impact on parkland in that they would be built at least in part on public parkland on both sides of the river. The plaintiffs also argue that this requirement of § 138 has not been met in that there have been no studies of the possible effects on the parkland of increased air pollution which might be caused by the bridge project, and that several planning agencies were not consulted for their views on the project's effect on the parklands.

There is no question that the final designs for the ramps and interchanges have not been completed at this time. (Tr. 621). While this may be an important consideration in determining whether construction is properly going forward in compliance with other sections of Title 23, the Court does not believe that this establishes that the Secretary's approval was improperly given under § 138. Secretary Volpe testified that he based his determination on the preliminary planning for the ramps and interchanges which had been done at that time. Although he conceded that the final design of the ramps was not complete, he pointed out that there were

very limited alternatives available. He stated that before he approved the bridge project, he was satisfied, and the Department of Interior, which had jurisdiction over the parklands, was satisfied, that the designs which would be developed based on the preliminary plans would result in a minimum taking of parkland. (Tr. 736–38).

The crucial consideration is that the program for the project includes all possible planning to minimize harm to the parklands. The Secretary has testified that he was satisfied that the planning which had been done indicated that a minimum of parkland would be taken for the ramps and interchanges for the bridge. The Court believes that this satisfies the requirements of the statute, and it will not disturb the Secretary's reasonable exercise of the discretion granted him by the statute. It should be noted that the National Park Service, the agency charged by statute with "conserv[ing] the scenery and the natural and historic objects and wildlife" within federal parklands, and with "provid[ing] for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations," [37] has approved the Three Sisters Bridge project. (Defendants' exhibits 16, 18).

Plaintiffs' other contentions are similarly insufficient to rebut the presumption of regularity attaching to the Secretary's actions. While it is true that there has been no study of the possible air pollutional effects of the bridge project, this Court will not write such a requirement into the statute. The Secre-

tary testified that air pollution was an overall consideration in this as well as all interstate highway projects. (Tr. 811). This is sufficient to satisfy the requirements of this section. Nor is the failure to consult with certain planning and advisory groups necessarily fatal to the Secretary's action. Affording the Advisory Council on Historic Preservation an opportunity to comment on highway projects affecting historic sites is required by 16 U.S.C. § 470 (Supp. V, 1970). But this project has been exempted from compliance with this and all other statutory requirements other than those of Title 23 of the U.S.Code by § 23 of the 1968 Highway Act.[38] In any event, the Court is not convinced that the Secretary foreclosed to the Advisory Council the opportunity to exercise their statutory function. The statute commits the determination of whether adequate planning has been done to the discretion of the Secretary, and this Court will not dictate what "all possible planning" consists of in this case and where it feels that the defendants have made a sufficient showing of substantial compliance with this section.

### PPM 20–8

Policy and Procedure Memorandum (PPM) 20–8 was adopted by the Bureau of Public Roads on January 14, 1969. It sets forth in detail the requirements for the public hearings called for in 23 U.S.C. § 128(a), and is included in the Code of Federal Regulations.[39] The purpose of the PPM is to insure maximum public participation in the determination of the location and design of Interstate Highway projects.[40] To that end, it provides

37. 16 U.S.C. § 1 (1964).

38. See n. 7, *supra*, and accompanying text.

39. 23 C.F.R. Part 1, Appendix A (1970).

40. Section 1 of the PPM provides as follows:

> a. The purpose of this PPM is to ensure, to the maximum extent practicable, that highway locations and designs reflect and are consistent with Federal, State, and local goals and objectives. The rules, policies, and pro-

cedures established by this PPM are intended to afford full opportunity for effective public participation in the consideration of highway location and design proposals by highway departments before submission to the Federal Highway Administration for approval. They provide a medium for free and open discussion and are designed to encourage early amicable resolution of controversial issues that may arise.

> b. The PPM requires State highway departments to consider fully a

for two public hearings prior to the approval of a project by the Federal Highway Administration. The first is a "corridor public hearing" (location hearing), which is to be held before the "State highway department is committed to a specific proposal," while the second is a "highway design public hearing" (design hearing), which is to be held "after the route location has been approved, but before the State highway department is committed to a specific design proposal." [41]

Section 6a of the PPM spells out the general conditions when both a location hearing and a design hearing must be held, or an opportunity for such hearings afforded:

a. Both a corridor public hearing and a design public hearing must be held, or an opportunity afforded for those hearings, with respect to each Federal-aid highway project that:

(1) is on a new location; or

(2) Would have a substantially different social, economic or environmental effect; or

(3) Would essentially change the layout or function of connecting roads or streets.

Because the previous regulations of the Bureau of Public Roads provided only for a single public hearing on location, special provisions were made for those projects which were in the planning process at the time of the adoption of the PPM, and upon which a hearing had already been held. Since a public hearing was held on the Three Sisters Bridge project on November 24, 1964, it is this provision which we are primarily concerned with in this case. Section 6d of the PPM provides as follows:

d. With respect to a project on which a hearing was held, or an opportunity for a hearing was afforded, before the effective date of this PPM, the following requirements apply:

(1) With respect to projects which have not received location approval:

(a) If location approval is not requested within 3 years after the date of the hearing or an opportunity for a hearing, compliance with the corridor hearing requirements is required unless a substantial amount of right-of-way has been acquired.

(b) If location approval is requested within 3 years after the date of the hearing or an opportunity for a hearing, compliance with the corridor hearing requirements is not required.

(2) With respect to those projects which have not received design approval:

(a) If design approval is not requested within 3 years after the date of the hearing or an opportunity for a hearing, compliance with the design hearing requirements is required.

(b) If design approval is requested within 3 years after the date of the hearing or an opportunity for a hearing, compliance with the design hearing requirements is nevertheless required unless the division engineer finds that the hearing adequately dealt with design issues relating to major design features.

At an earlier stage in this case the defendants contended that the PPM was not applicable to the Three Sisters Bridge project because it was adopted after the enactment of § 23 of the 1968 Highway Act which included the direction to build the bridge. This position was expressly rejected by the Court of Appeals, which stated that "we see no reason not to apply these regulations to

wide range of factors in determining highway locations and highway designs. It provides for extensive coordination of proposals with public and private interests. In addition, it provides for a two-hearing procedure designed to give all interested persons an opportunity to become fully acquainted with highway proposals of concern to them and to express their views at those stages of a proposal's development when the flexibility to respond to these views still exists.

41. *Id.* § 4.

this case." [42] Because different issues are raised regarding compliance or non-compliance with the requirements of § 6d as to location and design hearings, this Court will discuss them separately.

## I. LOCATION HEARINGS

■ The provisions of the PPM quoted above present two sets of standards to guide the Court in its determination as to whether a new location hearing need be held. Section 6a provides for a new location hearing if any of the three criteria are met. On the other hand, § 6d provides that for projects such as this where a public hearing has been held prior to the adoption of the PPM, the location hearing requirement is met if (1) location approval has been given prior to the effective date of the PPM, (2) location approval is requested within three years of the hearing, or (3) even if location approval is not requested within three years, if a substantial amount of the right of way has been acquired.

The Court believes that these two sections should be read together as its guide. The criteria established in § 6d should be the Court's primary guide since they apply specifically to projects upon which a hearing has been held. But the general standards of § 6a can be interpreted consistently with § 6d. That is, this Court must first determine if location approval was given to the project before the effective date of the PPM or if location approval was requested within three years of the hearing. Then the Court must review that approval or request to determine if the location approved or requested to be approved is a new or different location from that considered at the 1964 hearings, or if it would have an essentially different effect on connecting streets from that considered at the 1964 hearings.[43]

There is no real dispute between the parties as to whether location approval was given prior to the effective date of the PPM, thereby bringing this project in compliance with § 6d(1) of the PPM. In September, 1966, the District of Co-

42. D. C. Federation of Civic Associations, Inc. v. Volpe, No. 23,870 (D.C.Cir. April 6, 1970), Slip op. at p. 23. The Court of Appeals went on to explain what it felt were the issues before this Court on the remand with respect to the PPM:

These regulations apply to all projects which had not received both location and design approval from the Department of Transportation before the effective date of the regulations. Appellees assert that approval of the final location of the Bridge was obtained before that date. The accuracy of that assertion will be for the District Court to determine. However, appellees concede in their briefs that there has been no design hearing on the Bridge and that approval of the final design was not obtained before the regulations became effective. The regulations provide in § 6(d) (2) (b):

If design approval is requested within 3 years after the date of the hearing, compliance with the design hearing requirements is nevertheless required unless the division engineer finds that the hearing adequately dealt with design issues relating to major design features.

It may be that design approval was not requested before the end of the three-year period (see 23 C.F.R. Part 1, Appendix A, § 6(d) (2) (a)), or that, as appellees concede, the division engineer has not made the finding required by the regulation quoted above, or that even if the division engineer has made the required finding, the record will not support that finding. In any such case of non-compliance, the Bridge cannot proceed until design hearings which conform to the regulations have been held.

We have discussed the requirements of the hearing regulations with specificity because that issue has been clearly raised by the parties. We do not, however, confine the scope of the remand hearing to the question of compliance with those regulations. If the District Court finds that appellees have not complied with any provision of Title 23 (including the regulations contained in 23 C.F.R. Part 1, Appendix A), the District Court should enjoin further action on the Bridge project until appellees have complied with all such provisions.

43. There is no allegation by the plaintiffs that the presently planned project would have a substantially different social, economic or environmental effect than the project as considered at the 1964 hearings.

lumbia Department of Highways and Traffic requested from the Bureau of Public Roads' Division Engineer, Mr. Hall, approval to proceed with the preliminary engineering for survey and plan preparation for a new Central Potomac crossing from Spout Run on the Virginia side to the District of Columbia shore in the vicinity of Foxhall Road. (Plaintiffs' exhibits 34, 35). These requests were accompanied by a map showing the location of the bridge as presently planned. (Plaintiffs' exhibit 33). On September 21, 1966, Mr. Hall granted the requested approval. (Plaintiffs' exhibit 36). Although there is considerable controversy over the meaning of these documents with respect to design approval, there is no question that they constituted the request for and the grant of approval for the preparation of contract plans for the project at the location where construction is presently going forward.

If § 6d is considered the sole criterion for this Court's review as to whether there has been compliance with the PPM, the above determination would be conclusive as to the location hearing requirement. But as discussed above, the more reasonable interpretation of the PPM requires that this Court make a further review to insure that § 6a has been complied with. The Court must therefore decide whether the location approved by Mr. Hall in September, 1966, is a new location as compared with those considered at the time of the 1964 hearings or if the present location will have a substantially different effect on connecting streets than the plans considered at the 1964 hearings.

The public hearing which was held in November, 1964, was based on a location study prepared by the consulting engineering firm of Howard, Needles, Tammen and Bergendoff.[44] The Howard Needles Report was prepared at the request of the District of Columbia Department of Highways and Traffic and was based on the assumption that an additional Central Potomac crossing was needed. The Report sets forth three alternative locations for satisfying that need by means of a new bridge. Plan I is for a bridge downstream from Key Bridge in the vicinity of Theodore Roosevelt Island. Plan II provides for a bridge crossing the river at approximately a 45 degree angle approximately 1,000 feet downstream from the Three Sisters Islands. Plan III called for a bridge approximately 2,400 feet upstream from the Three Sisters Islands in the vicinity of the Georgetown Reservoir.

The Howard Needles Report was made available to interested persons prior to the hearing and its conclusions were explained at great length by a partner of the firm at the commencement of the hearing. The transcript of the 1964 hearings is in evidence in this case (defendants' exhibit 7), and the Court has read it in its entirety. The majority of the witnesses voiced their opposition to any New Central Potomac crossing, although some did comment on the merits of the alternative proposed plans.

There is no question that the present bridge project is not going forward at any of the locations proposed in the Howard Needles Report. The present plans call for a crossing perpendicular to the river upstream from the proposal in Plan II of the Report by approximately 1,500 feet on the District of Columbia shore and 950 feet on the Virginia shore. In determining whether this change in location is sufficiently substantial to require that a new hearing be held the Court is guided primarily by the PPM itself. As discussed above, the purpose of the PPM is to insure public participation to the maximum extent possible in the selection of the location and design of Interstate Highway projects. To this end, the location hearing is required to be held prior to the selection of a definite location by the state highway department in order that views expressed by the public as to the proposed location and any possible alternatives may have some

---

44. Plaintiffs' exhibit 10, hereinafter referred to as the Howard Needles Report.

effect on the ultimate selection of the location of a project.

 It appears to the Court that the PPM contemplates that minor changes in the proposed location may be made by the state highway officials after the public location hearing, perhaps in response to proposals and suggestions made at the hearing. If this change is so substantial as to amount to a new location that the public has not had the opportunity to comment upon, a new location hearing would be required by the PPM prior to any final commitment to the new location. The Court feels, however, that a reasonable reading of the PPM is that if the change is so insubstantial that the public would not be affected any differently than by the original proposal which formed the basis for the first hearing, then the change can be made without the necessity of going through the formality of a new hearing to allow the public the opportunity to express the same views that it did at the previous hearing. Therefore in determining what is a "new location" within the meaning of § 6a(1) of the PPM, the crucial considerations are: (1) whether the proposed change in location affects the public in such a way that certain members of the public, who were not affected by the proposal which served as the basis for the first hearing, would be affected by the new proposal and therefore should be given an opportunity to air their views at a new hearing; and (2) whether members of the public who were on notice of the effect of the first proposal with respect to their interests and therefore were given an opportunity to present their views at the first hearing, would have substantially different views to present on the new proposal.

 Applying these principles to the present case, this Court concludes that the present location of the Three Sisters Bridge, although not identical with any of the proposals in the Howard Needles Report which served as the basis for the 1964 hearing, is not a "new location" within the meaning of § 6a(1) of the PPM. The 1964 hearing afforded the public an opportunity to comment on three proposed crossings in the area from just upstream from Theodore Roosevelt Island to the Georgetown Reservoir. The bridge presently under construction is within this area and is only from 950 to 1,500 feet upstream from one of the alternatives in the Howard Needles Report. The Court cannot conceive how any members of the public would be affected differently by the present location than by one of the three proposed in the Howard Needles Report. Important to keep in mind in this respect is the fact that under the present plans, no private property will be taken for the bridge or its ramps and interchanges. (Tr. 1397). The Court concludes that the Howard Needles Report gave notice to all interested citizens who might be affected by a new crossing at any of the three alternatives therein or at any point in between. The list of participants at the hearing supports this conclusion.[45] The fact that the majority of those appearing at the hearing chose to discuss the question of whether any new bridge was

---

45. A partial listing of the organizations which were represented at the 1964 hearing indicates that all persons who might be affected by a new bridge at any location in the area covered by the Howard Needles alternatives were given the opportunity to present their views on the proposed crossing: Arlington County Cultural Heritage Commission; Georgetown Canal and Riverside Council; Arlington County Board; Georgetown University; North Highland Citizens Association, Virginia; Committee of 100 on the Federal City; Fairfax County Chamber of Commerce; Cathedral Heights—Cleveland Park Citizens Association, Washington, D. C.; Arlingtonians for the Preservation of the Potomac Palisades; Northwest Committee for Transportation Planning; Parkway Citizens Association, Virginia; Palisades Citizens Association, Washington, D. C.; Arlington County Civic Federation; Arlington Citizens Association; D. C. Federation of Civic Associations, Inc.; Arlington Council of PTAs; Citizens Association of Georgetown; Shepherd Park Citizens Association, Washington, D. C.; Arlington Chamber of Commerce.

necessary does not affect this conclusion. All that is required by the PPM is that the public be given the opportunity to present their views as to the location of the project. If those appearing at the hearing choose not to do so, this is of no consequence to the decision that there has been compliance with the PPM location hearing requirement.

The principal difference between the presently planned bridge project and those considered at the 1964 hearings is not the result of the insubstantial change in the location of the bridge, but rather is a consequence of the change in the design of the ramps and interchanges providing access to the bridge, and the effect these changes have on the layout and function of connecting streets. The project as now planned will have a somewhat different effect on connecting streets. Plan II of the Howard Needles Report, which is the closest alternative to the presently planned project, provided for a direct connection between the bridge and MacArthur Boulevard and Foxhall Road, two main arteries in Northwest Washington. (Plaintiffs' exhibit 10, p. 33; Tr. 523). It also provided that traffic from these two arteries headed for downtown Washington would have access to the new Potomac River Freeway. Although at present the planning for the ramps and interchanges for the bridge has not been completed, the present plans provide for no direct access to and from the bridge or the Potomac River Freeway and MacArthur Boulevard and Foxhall Road. (Tr. 527, 1517). In view of the fact that the present Whitehurst Freeway will become the westbound lanes of the Potomac River Freeway, this means that traffic from MacArthur Boulevard and Foxhall Road would be forced to use M Street in Georgetown both to attain access to the Three Sisters Bridge and to get to downtown Washington. (Tr. 546, 1517).

It should be noted that the location and design of the Potomac River Freeway are not issues in this case. The fact that no means of ingress or egress are provided between the Freeway and the MacArthur-Foxhall area is not a factor in considering the effect of the Three Sisters Bridge on connecting streets. The issue raised by the plaintiffs of the necessity of using M Street to get from the MacArthur-Foxhall area to downtown Washington under present plans for the Freeway does not involve the bridge or its ramps and interchanges and is therefore irrelevant to this action.[46] Therefore the only issue before this Court is whether the decision to delete the direct access between MacArthur Boulevard and Foxhall Road and the bridge "essentially change(s) the layout and function of connecting roads and streets," and if it does whether this requires that a new location hearing be held before construction may proceed.

Plaintiffs emphasize that the present plans for the interchanges, by deleting the connection with the MacArthur-Foxhall area for the Three Sisters Bridge, will result in a substantial increase in traffic on already overburdened M street in Georgetown. The Court does not believe that a sufficient showing has been made that the bridge as now planned will so essentially change the layout and function of connecting streets and roads as compared with the 1964 proposals so as to require a new location hearing. The evidence is conflicting as to the effect which the presently planned interchanges will have on traffic on M Street. Traffic approaching the new bridge from

46. Unless Northwest Washingtonians heading for the downtown area would choose to go by way of Virginia, which is a highly implausible choice.

There was evidence at the trial that because there would be no direct connection between Key Bridge and the Potomac River Freeway, that the nature of Key Bridge would be changed, in that it would be rendered primarily a local crossing between Rosslyn and Georgetown. (Tr. 1519). While this is certainly an essential change in the function of Key Bridge, this change is caused by the plans for the Potomac River Freeway, not the Three Sisters Bridge, and it is therefore also irrelevant to this action.

MacArthur Boulevard or Foxhall Road might be required to proceed on M Street to 27th Street before gaining access to an approach for the bridge (Tr. 546), and a similar situation may exist for traffic crossing the bridge headed for the MacArthur-Foxhall area. (Tr. 524). But there is also evidence that the planned Palisades Parkway which will parallel the river from the Potomac River Freeway may alleviate this problem. (Tr. 1393–94).

In any event, even assuming that the presently planned interchanges will essentially change the layout or function of connecting streets, as compared with the 1964 proposals, the Court does not believe that a new location hearing would serve any useful purpose. The possible adverse effects to connecting streets is not the result of any change of the location of the bridge and/or the ramps and interchanges for the bridge. Rather, the possible changes in the nature and function of connecting streets is a result of changes in the design of the proposed interchanges. There is no evidence that an interchange providing a direct connection between the bridge and the MacArthur-Foxhall area could not be constructed at the location at which the bridge is now planned as well as 1,500 feet downstream as proposed in Plan II of the Howard Needles Report. Therefore a new location hearing would serve no useful purpose. The design of the interchanges and ramps for the bridge is a more appropriate topic for public discussion at a design hearing, the need for which the Court will now discuss.

## II. DESIGN HEARINGS

Prior to the adoption of PPM 20–8 in January, 1969, there was no requirement in the regulations under 23 U.S.C. § 128 for a separate design hearing. Therefore the provisions in the PPM for projects upon which a hearing had been held

as of the effective date of the PPM are different for design hearings than they are for location hearings. [Compare § 6d(1) with § 6d(2)]. The Court of Appeals indicated that there are three factual issues which this Court must decide in its determination of whether the PPM requirements for a design hearing have been met: (1) whether design approval was requested within three years after the 1964 hearings; (2) whether the Division Engineer has made the finding that the 1964 hearings adequately dealt with design issues relating to major design features; and if he has made this finding, (3) whether the finding is supported by the record.[47] Since § 6d(2) applies only "to those projects which have not received design approval," a preliminary question which this Court must resolve is whether the Division Engineer had given the project design approval prior to the adoption of the PPM. This question was not enumerated by the Court of Appeals because of the defendants' concession in that Court that the *final* design of the project had not been approved prior to the adoption of the PPM.[48]

The resolution of the issues of whether design approval was requested within three years of the 1964 hearing or was given prior to the adoption of the PPM depends on the Court's finding as to the significance of the actions of the District of Columbia Department of Highways and Traffic and the Division Engineer in September, 1966. These actions are relied upon by the defendants to show that design approval was requested and granted at that time. As the discussion below indicates, Mr. Hall granted whatever the District requested at that time, so that if the request was for design approval, then design approval was granted at that time.

On September 21, 1966, Mr. Hall, acting on the basis of two letters from the District of Columbia Department of

47. D. C. Federation of Civic Associations, Inc. v. Volpe (D.C.Cir., decided April 6, 1970), Slip op. at p. 23, n. 54; see n. 42, *supra*.

48. *Id.*

Highways and Traffic (plaintiffs' exhibits 34, 35), an attached map (plaintiffs' exhibit 33) and two program data forms (defendants' exhibits 3, 4), granted the District of Columbia authorization to proceed with "preliminary engineering for survey and plan preparation." (Plaintiffs' exhibit 36). This Court has found that by these documents, the District of Columbia requested and Mr. Hall granted location approval within the meaning of § 6d(1) of the PPM. The question now before the Court is whether the documents also amounted to a request for and a grant of design approval as that term is used in PPM § 6d(2).

The opinion of the Court of Appeals strongly suggests that "design approval" as used in the PPM is to be interpreted to mean approval of the final design for the project. In discussing the questions which would be before this Court in determining whether the PPM has been complied with, the Court of Appeals stated that "appellees concede * * * that approval of the *final* design was not obtained before the [PPM] became effective." [49] The Court then went on to list the three questions which are raised by § 6d(2) of the PPM. Plaintiffs argue that it may be inferred from this statement that the Court of Appeals interpreted "design approval" as approval of the final plans, specifications and estimates for the project. This interpretation appears reasonable to this Court. As discussed above, the purpose of the PPM is to insure maximum public participation in the selection of the location and design of Interstate Highway projects. Since the previous regulations provided only for a location hearing, the Court concludes that the PPM provides for a design hearing for those projects already in the planning process unless they had progressed to the point where the final plans had been prepared and approved. At this stage a design hearing would serve no useful purpose since a commitment would already have been made for the design of the project.

There is no question that approval of the final design, or approval of the plans, specifications, and estimates for the entire project, has neither been requested nor has it been granted. (Tr. 1097). Therefore if the above interpretation of "design approval" is correct, as this Court believes it is, a design hearing is required by § 6d(2)(a) of the PPM and construction of the bridge cannot go forward until it has been held.

Even if this interpretation is incorrect in requiring approval of the final plans for the project, this Court believes that the actions of the District of Columbia Department of Highways and Traffic and the Division Engineer in September, 1966, did not constitute either the request for or the grant of design approval under any reasonable interpretation of the PPM. Mr. Hall himself has described his understanding of "design" as the "entire gamut from decision to start preparation [of] contract plans until a plan is put up to be bid by contractors." (Tr. 486–87, 1094). Mr. Hall described his action of September 21, 1966, in approving the preparation of contract plans as "a start of the design process." (Tr. 560).

The testimony of Mr. Hall establishes that in September, 1966, the District of Columbia was unsure of many important aspects of the bridge design. At that time no decision had been made as to what type of bridge and interchanges would be built (Tr. 558); what the appearance of the bridge would be (Tr. 559); and the preliminary plans were for a bridge with a single 850 foot span over the river with no piers in the river. (Tr. 559). Mr. Hall testified that at the time that he authorized the preparation of contract plans he did not have before him for consideration any drawings or engineering materials indicating design factors other than the map which was submitted by the District. (Tr. 557; plaintiffs' exhibit 33). No vertical alignment is shown on that map, although he testified that certain inferences about

49. *Id.* (Emphasis supplied).

the vertical alignment could be drawn from the fact that the bridge shown went under the eastbound lanes of the George Washington Memorial Parkway and over the westbound lanes. (Tr. 559). It is also clear that Mr. Hall was considering only the bridge from abutment to abutment and not the ramps and interchanges in his actions at that time. (Tr. 1174).

An examination of the documents involved in the September, 1966, action supports the plaintiffs' contention that design approval was neither requested nor granted at that time. The letter from Mr. Rivard, the Chief Engineer for Planning and Programming of the District highway department, to Mr. Hall, dated September 19, 1966, (plaintiffs' exhibit 34) states that it was submitted "in support of the request for approval for preliminary engineering" for three projects including a new Central Potomac River Crossing. The letter discusses several of the studies which had been made showing the need for a new bridge. While it alludes generally to design studies, it contains no specifics as to the design of the projects, and further states:

> The design of these facilities *will be developed* in such a manner as to allow traffic to approach and leave the facility efficiently. (Emphasis supplied).

The letter from Mr. Airis, the Director of the District highway department, to Mr. Hall, dated September 21, 1966, (plaintiffs' exhibit 35) does indicate that the bridge will have six lanes, but this is the only reference to a design feature. The letter concludes:

> Since these projects have now cleared the last major planning objectives, *I wish to proceed with engineering design.* I, therefore *request* your *approval of final location alignment* of these four projects * * *. (Emphasis supplied).

The map submitted with this letter, (plaintiffs' exhibit 33) indicates the horizontal alignment of the proposed bridge, the possible location of interchanges, and, as discussed above, gives rise to some inferences as to the vertical alignment of the bridge. (Tr. 558–59). In addition, the program data for the project, indicates that the bridge will be a six lane, controlled access facility, and gives the lengths for the spans as the bridge was planned at that time. (Tr. 1199–1200; defendants exhibit 4).

The Court finds that the above documents do not constitute a request for design approval. While certain basic design features had been determined at that time, i. e., number of lanes, controlled access, and horizontal alignment, the Court does not believe that these features are a sufficient basis for a request for design approval as that term is used in the PPM. Mr. Airis' letter specifically states that what is being requested is "approval of final location alignment," and this is the only request in the letter. (Tr. 1288). From the evidence in this case, the Court concludes that this was the only approval which was requested at that time.

Since the Court finds that no design approval was requested, it cannot be said that any was granted by Mr. Hall's authorizing the District to proceed with the preparation of contract plans. The letter of authorization (plaintiffs' exhibit 36) contains no reference to any sort of approval being granted. This mere authorization for the District of Columbia to proceed with the development of plans for the bridge cannot be said to be sufficient documentation of design approval so as to render unnecessary compliance with the PPM design hearing requirement for this project.

The planning activities following the September, 1966, authorization support this finding that insufficient design work had been done on the project for design approval to have been requested or granted at that time. It was only after Mr. Hall's action in September, 1966, that the District, again with the approval of Mr. Hall, retained the consulting engineering firm of Howard, Needles, Tammen, and Bergendoff, to develop several alternative designs for the proposed bridge. (Tr. 567). Several al-

ternative designs were developed and submitted to the Fine Arts Commission, which in September, 1967, approved the design of the bridge which is presently to be built. (Tr. 573). In December, 1967, the Type, Size and Location (TS&L) Report for the project was forwarded by the Howard, Needles firm to the District of Columbia Department of Highways and Traffic, which in turn submitted it to Mr. Hall for approval. (Plaintiffs' exhibit 57; Tr. 1090). Mr. Hall has never approved the TS&L Report because of doubts as to the structural feasibility of the planned superstructure. (Tr. 574; plaintiffs' exhibit 85).

The Court concludes that the submission of the TS&L Report to the Division Engineer for approval is the first act which might be construed as a request for design approval within the meaning of the PPM. It was only at this time that design work had progressed to the point that it might have justified denial of the opportunity for a design hearing required by the PPM.[50] Since the TS&L Report has never been approved by the Division Engineer and was submitted sometime in December, 1967, or thereafter, (Tr. 1090) the request for design approval was not made within three years of the November, 1964, hearings, and therefore a design hearing is required by § 6d(2) (a) of the PPM before construction can proceed.

The defendants contend that this Court should accept the consistent and reasonable administration interpretation of the PPM that design approval is requested and granted at the time of the request for and grant of authorization to proceed with the preparation of contract plans. Mr. Hall testified that his interpretation of the PPM was that design approval was given at this time on the basis of the major design features which were certain at that time, such as number of lanes, construction standards, general horizontal and vertical alignment, and the type of structure to be built. (Tr. 1196–97). Mr. Turner, the Federal Highway Administrator, testified that the nationwide interpretation is that design approval is given when major design features were known, and further defined such major design features as those "things that would have major effect on the community or factors which would need to be known in order to give instructions to an engineering firm to develop the blueprint plan." (Tr. 989). He further testified that normally this approval was granted at the time of the authorization to proceed with the preparation of contract plans. (Tr. 989). The defendants argue that this interpretation is reasonable in that the authorization by the Division Engineer for the preparation of contract plans is the natural point on the relationship between the Bureau of Public Roads and the state highway department for design approval to be given. This argument is based on the fact that it is the only formal approval required during the planning process until the approval of the final plans, specifications, and estimates.

[14] This Court is well aware of the deference which it must give to the interpretation of administrative regulations by the administrative officials who promulgate and enforce them. However, the

---

50. The Court, however, adheres to its earlier expressed view that the PPM requires that approval be given to the final design before compliance with the design hearing requirement is obviated.

The Court recognizes that a TS & L Report is not required as part of the planning process for every Interstate Highway project. But the Court is not ruling that the submission of the TS & L Report is *per se* the first request for design approval within the meaning of the PPM. Rather, the Court is merely holding that, *on the facts of this case,* no request for design approval was made prior to the submission of the TS & L Report to the Division Engineer.

It should also be noted that Mr. Hall testified that at this time he is still uncertain as to the design of the ramps and interchanges for the bridge. (Tr. 526). In view of this fact, it is difficult to see how this part of the project could have been given any sort of meaningful design approval.

presumption in favor of accepting the administrative interpretation of a regulation is not absolute. The interpretation must be within the bounds of reason and not inconsistent with the regulation itself. *See* Udall v. Tallman, 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Robertson v. Udall, 121 U.S.App. D.C. 218, 221, 349 F.2d 195, 198 (1965).[51]

■ The Court concludes that the interpretation proposed by the defendants is unreasonable and inconsistent with the terms of the PPM itself. As stated before, the purpose of the PPM is to insure maximum public participation on the selection of the location and design of Interstate Highway projects. In providing for projects upon which a hearing had been held prior to its effective date, the PPM takes into account that previously only one public hearing on the location of the project was required. Section 6d therefore provides more stringent criteria for exempting such a project from the design hearing requirement than from the requirement for a new location hearing. [Compare § 6d(2) with § 6d(1)]. One of the purposes of the PPM is to require a design hearing for any project, unless the planning for the project had progressed to such a degree that a hearing would be a useless formality because a commitment had already been made for the design of the project, or unless the previous public hearing dealt adequately with matters of design.

The interpretation proposed by the defendants is inconsistent with this purpose of the PPM. Under that interpretation, design approval can be given, and therefore the necessity of a design hearing avoided, at a time when only the barest minimum of the design features of the project are known. This inter-

pretation also means that design and location approval are given at the same time and by the same act. This appears to the Court to be inconsistent with the separate provisions for design and location approval in the PPM. In view of these separate provisions, the PPM cannot be reasonably interpreted as providing that a request for design approval is included in a request for location approval such as in Mr. Airis' letter of September 21, 1966, (plaintiffs' exhibit 35) or that the response to such a letter by the Division Engineer includes design approval.

In view of the foregoing discussion, the Court concludes that no request for design approval within the meaning of the PPM was made within three years of the 1964 hearings, nor was any design approval granted prior to the adoption of the PPM in January, 1969. Therefore, § 6d(2) (a) of the PPM requires that a new design hearing be held before construction work on the bridge may proceed any further.

This ruling renders moot the final two questions posed by the Court of Appeals decision, i. e., whether the Division Engineer has made the finding required by § 6d(2) (b) of the PPM that the 1964 hearings adequately dealt with design issues relating to the major design features of the project, and whether this determination, if made, is supported by the record. But, in the event that the above interpretation of the PPM is not accepted, this Court will discuss these two questions.

Mr. Hall testified that he made the required finding after skimming through the transcript of the hearing in the Summer of 1969. (Tr. 1130, 1168). He did

---

51. The customary deference to an administrator's interpretation of his own regulation is somewhat negated in this case by the lack of evidence of any official interpretation prior to the commencement of this suit supporting the testimony of Messrs. Turner and Hall. In fact, the sole documentary evidence as to an official interpretation of the PPM indicates that there must be some "documentation clear-

ly stating approval of the design." (Plaintiffs' exhibit 75). As discussed above, the Court finds that there is not sufficient documentation of design approval in this case. In addition Mr. Hall testified that he had never discussed the meaning of the PPM with any of his superiors in the Bureau of Public Roads, and thus his interpretation was his personal interpretation.

not, however, make any record of this finding at that time. The only record of the finding is a memorandum, dated November 17, 1969, and signed by Mr. Hall, which purports to summarize his finding that the 1964 hearings complied with the requirement of § 6d(2) (b) of the PPM. (Defendants' exhibit 6). For many of the same reasons which were discussed with relation to the Holmes Memorandum,[52] the Court finds that this memo is of little probative value on the question of whether Mr. Hall made the required finding. Although the Court notes the absence of a contemporaneous record of this finding, it finds that the plaintiffs have not carried their burden of proving that Mr. Hall did not make the required finding. The Court believes the testimony of Mr. Hall, a dedicated government employee with many years of service, and finds that he did make the required finding in the Summer of 1969.

 But the question of whether that finding is supported by the record is a more difficult one. A preliminary question is presented as to what is meant by "design issues relating to major design features" as that term is used in § 6d(2) (b) of the PPM. The defendants argue that the PPM does not define "design issues relating to major design features," but that the interpretation of the term is left to the discretion of the Division Engineer. They contend that the best guide in the PPM as to the meaning of the term is the listing in § 10b of "essential elements" which must be included in the design study report to be submitted to the Bureau of Public Roads with all new requests for design approval.[53] The elements listed correspond to the Division Engineer's interpretation of "design issues relating to major design features." (Tr. 1220).

The plaintiffs direct the Court's attention to § 4 of the PPM, which, in defining a "highway design public hearing," provides that it must afford the public the opportunity to comment on "major highway design features, including the social, economic, environmental, and other effects of the alternate designs." [§ 4b (3)]. The PPM goes on to list, in § 4c, twenty-three factors which are included within the meaning of the term "social, economic and environmental effects." [54]

52. See n. 31, *supra*. Like the Holmes Memorandum, this memo was prepared at the request of Mr. Reis, a Department of Transportation attorney engaged at the time in the defense of this suit. (Tr. 429). This request was made and the memo was prepared after the filing of the complaint in this action, which alleged noncompliance with the PPM. (Tr. 430). Mr. Hall knew of this suit at the time of the preparation of the memo. (Tr. 1293).

53. Section 10b(1) (b) of the PPM provides that a design study report must be submitted to the Bureau of Public Roads by the state highway department with all requests for design approval:

(b) Design study reports must describe essential elements such as design standards, number of traffic lanes, access control features, general horizontal and vertical alignment, right-of-way requirements and location of bridges, interchanges, and other structures.

54. The twenty-three factors, upon which the public must be given the opportunity to comment in any design hearing held on this or any other project, are as follows: (1) Fast, safe and efficient transportation. (2) National defense. (3) Economic activity. (4) Employment. (5) Recreation and parks. (6) Fire protection. (7) Aesthetics. (8) Public utilities. (9) Public health and safety. (10) Residential and neighborhood character and location. (11) Religious institutions and practices. (12) Conduct and financing of Government (including effect on local tax base and social service costs). (13) Conservation (including erosion, sedimentation, wildlife and general ecology of the area). (14) Natural and historic landmarks. (15) Noise, and air and water pollution. (16) Property values. (17) Multiple use of space. (18) Replacement housing. (19) Education (including disruption of school district operations). (20) Displacement of families and businesses. (21) Engineering, right-of-way and construction costs of the project and related facilities. (22) Maintenance and operating costs of the project and related facilities. (23) Operation and use of existing highway facilities and other transportation facilities during construction and after completion.

Plaintiffs argue that since these twenty-three factors are included in the PPM definition of "major highway design features," they are also included within "design issues relating to major design features" as that term is used in § 6d(2) (b).

This Court concludes that the interpretation proposed by the plaintiffs is a more reasonable one. The PPM, in § 4, defines "major highway design features" to include the factors discussed above. The Court does not see any substantial difference between the terms "major highway design features" and "design issues relating to major design features." Therefore, the Court concludes that the latter term includes the same factors as the former, and that the Division Engineer's finding can be said to be supported by the record only if those factors were adequately dealt with at the 1964 hearings. Section 10 of the PPM, relied upon by the defendants, does not in any way deal with the design hearings required by the regulation, but rather is concerned with the information which must be forwarded to the Bureau of Public Roads by a state highway department when it seeks design approval for a project. Therefore it does not appear as relevant to the question before this Court as does § 4, which provides the definition of a design hearing.[55]

The Court concludes that the Division Engineer's finding that the 1964 hearings "adequately dealt with design issues relating to major design features" is not supported by the record of the 1964 hearings for two reasons. The first is that the project as proposed at the 1964 hearings is of a substantially different design than the project which is presently planned. The second is that the 1964 hearings did not deal with several of the major design features of the project as that term is used in the PPM.

The Court adheres to the same position regarding the changes in the design of the project following the public hearing that it set forth with regard to changes in location. That is, that the PPM contemplates that changes in design may be made after the hearing, perhaps as a result of suggestions received at the hearing, without the necessity of holding another design hearing. A new hearing is required only in those instances where the changes are so substantial that they amount to a new design and therefore the public should be given an opportunity to comment. The Court, however, reaches a different conclusion in applying these criteria to the design of the project than it did as to the location. The Court finds that the present design of the bridge is so substantially different from that proposed in 1964, that the public should be given an opportunity to present their views on the project as presently planned.

The basis for the 1964 hearings on the Three Sisters Bridge project was the Howard Needles Report. This Report was primarily concerned with the discussion of several possible locations for the proposed Central Potomac crossing, but some design features were discussed. At several instances during his testimony, Mr. Hall testified that the presently

55. Defendants argue that this interpretation will produce the "absurd" result of applying a more stringent standard to the determination of the sufficiency of hearings held prior to the PPM than to new design hearings. This is based on the fact that new design hearings must merely afford the public the opportunity to comment on the factors enumerated in § 4c, while § 6d(2) (b) requires that the Division Engineer find that the factors were in fact adequately dealt with in the prior hearing.

The Court agrees that this is the result of its ruling, but it does not feel that it can be characterized as "absurd" in light of the purpose of the PPM to insure maximum public participation in the selection of the location and design of Interstate Highway projects. The Court believes that the PPM should be interpreted as favoring a design hearing on projects already planned at the time of its adoption unless such hearings would be a useless formality. Therefore it seems reasonable to apply a more stringent standard to hearings held prior to the effective date of the PPM when there was no requirement for a design hearing.

planned bridge is a different bridge from that proposed for Plan II in the Howard Needles Report. He testified that the present bridge was not considered at the 1964 hearings, and as an explanation added that the present bridge is a "different type bridge" at a slightly different location from that shown in the Howard Needles Report. (Tr. 542–43). Upon examination by government counsel, Mr. Hall stated that "the bridge that is being designed was not considered at the public hearing." (Tr. 1274).

Several significant differences between the design of the bridge considered at the 1964 hearings and the presently planned bridge have been raised. Plan II of the Howard Needles Report called for a bridge crossing the river at a forty-five degree angle, while the present plans provide for the bridge to be constructed at right angles to the river. (Tr. 515). Therefore the horizontal alignment of the present project was not considered at the hearing. Plan II provided for a tunnel through the Virginia palisades, while the present plans avoid the need for a tunnel by using the Spout Run valley for the Virginia approaches to the bridge. (Tr. 515). Different parkland and a different quantity of parkland will be used for the present project. (Tr. 515–16.) The bridge design pictured in Plan II included approach ramps over the river itself and the approaches infringed on the Glover-Archbold Park. The present plans call for the ramps to be built over the land with no incursion into the park. (Tr. 516). The Howard Needles proposal is for a bridge with several short spans and several piers in the river, while the present plans call for one long main span crossing the river supported only by two piers. (Tr. 522). The present plans delete the direct access between the bridge and MacArthur Boulevard and Foxhall Road, which was provided in Plan II. (Tr. 524). And last but not least, the cost of the present project is estimated at twenty million dollars as compared with an estimate of six million in 1964. (Tr. 515, 1180–82).

In view of these differences between the project as presently planned and the proposal considered at the 1964 hearings, the Court concludes that the public has not had the opportunity to comment on the major design features of the presently planned project, and therefore the Division Engineer's finding under § 6d(2) (b) of the PPM is not supported by the record.

There was also considerable testimony to the effect that several of the factors listed in § 4c of the PPM were not considered at the 1964 hearings. (Tr. 1171–88). The Court has ruled that "design issues relating to major design features" include these factors. Therefore the fact that these factors were not considered for the project as presently planned at the 1964 hearings also renders the Division Engineer's finding unsupportable by the record.

*23 U.S.C. § 128(a)*

This section provides as follows:

(a) Any State highway department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, town, or village, either incorporated or unincorporated, shall certify to the Secretary that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic and social effects of such a location, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community. Any State highway department which submits plans for an Interstate System project shall certify to the Secretary that it has had public hearings at a convenient location, or has afforded the opportunity for such hearings, for the purpose of enabling persons in rural areas through or contiguous to whose property the highway will pass to express any objections they may have to the proposed location of such highway.

The responsibility for making the certification called for in this section has

been delegated to Mr. Sheaffer, the Chief of the District of Columbia Department of Highways and Traffic's Office of Engineering. The certification was made in two letters from Mr. Sheaffer to Mr. Hall, the Bureau of Public Roads Division Engineer. (Plaintiffs' exhibits 88, 96). The first letter dated August 29, 1969, certifies that public hearings had been held and that the department had considered the economic effects of the project. In a letter dated October 9, 1969, Mr. Sheaffer supplemented this certification by stating that the highway department had considered not only the economic effects of the bridge, but also its social effects, its effects on the environment, and its consistency with such urban planning as has been promulgated by the community. The first certification was based on the requirements of § 128(a) as they existed prior to 1968, while the supplementary certification was prepared for the purpose of complying with the section as amended by § 24 of the Federal-Aid Highway Act of 1968.

The plaintiffs contend that the certifications are invalid because they were not made by Mayor Washington, the official who is required by this statute and Title 7 of the D.C. Code to make the certification. This is the same argument that is raised in connection with § 103. For the reasons stated in the Court's ruling on that section, *infra*, this argument is rejected as insufficient to establish noncompliance with § 128.

The first certification required by § 128(a) is that public hearings have been held or the opportunity for public hearings afforded. This Court has ruled that the District of Columbia has not held the public design hearings required by the Department of Transportation Policy and Procedure Memorandum 20–8, the hearing regulation implementing § 128(a). Therefore, the certification that the public hearings have been held as required by § 128 is not supported by the record, and must be set aside.

The plaintiffs contend that the certifications must be set aside as arbitrary and capricious in that Mr. Sheaffer, the

official who made the certifications, did not know if adequate consideration had been given within the highway department to the factors included in the certification. Mr. Sheaffer testified that all matters pertaining to planning and the consideration of the economic, social, and environmental effects of highway projects are carried on by the highway department planning staff before a project was submitted to his division within the department. (Tr. 457). Therefore he could not say of his own personal knowledge what specific economic, social or environmental effects of the proposed bridge project had been considered by the department at the time of his certification, (Tr. 433–34) or how the project was consistent with local urban planning. (Tr. 435). He stated that he was confident that the planning staff of the department had considered all of the requirements of the statute. (Tr. 434, 458). But the basis of his confidence was not any personal knowledge that the statutory requirements had actually been complied with, but his assumption that all of the required factors had been taken into consideration in order for the project to have progressed to the stage of submitting construction plans to the Bureau of Public Roads for approval. (Tr. 458).

The Court recognizes that § 128 requires that the certification be made by the state highway department rather than by any specific individual. If the certification requirement is to be given any effect, however, the certificate should be made by an official who has some knowledge of the actions to which he is certifying. Of course, no one individual within the department would have considered all of the requirements of the section personally, but the certifying officer should be one who knows as a fact that the actions to which he is certifying have been taken. In this case, Mr. Sheaffer relied on his assumption that all of the required effects had been considered merely because the project had reached the stage where the certification is normally made. The Court

finds that this assumption is an insufficient basis for the certification.

The plaintiffs also contend that the certification that the project was consistent with the goals and objectives of such urban planning as has been promulgated for the community is not supported by the record because of the National Capital Planning Commission comprehensive transportation plan which did not include the Three Sisters Bridge. This is the same argument that was raised in connection with § 134. For the reasons stated in the Court's ruling on that section, *infra*, the Court rejects this contention.

### 23 U.S.C. § 109(a)

This section provides as follows:

> The Secretary shall not approve plans and specifications for proposed projects on any Federal-aid system if they fail to provide for a facility (1) that will adequately meet the existing and probable future traffic needs and conditions in a manner conducive to safety, durability, and economy of maintenance; (2) that will be designed and constructed in accordance with standards best suited to accomplish the foregoing objectives and to conform to the particular needs of each locality.

The duties imposed on the Secretary of Transportation by this section have been delegated to the Bureau of Public Roads' Division Engineer for the area in which the project is to be constructed. The question before the Court in determining whether there has been compliance with § 109 for the Three Sisters Bridge project is whether the Division Engineer for the District of Columbia, Mr. Hall, in approving certain plans and specifications for preliminary construction for the bridge, reasonably concluded that the facility would satisfy traffic needs "in a manner conducive to safety, durability and economy of maintenance."

On September 2, 1969, Mr. Hall approved the plans, specifications, and estimates for the construction of the piers for the Three Sisters Bridge, which had been submitted to him by the District of Columbia Department of Highways and Traffic earlier that day. (Plaintiffs' exhibits 89, 90). This approval was, in effect, an authorization to begin construction of the piers. The District then proceeded to advertise for bids for the construction of the piers, and later that month awarded a contract for preliminary construction work on the piers.

The plaintiffs contend that Mr. Hall's approval of the plans, specifications and estimates for the construction of the piers violated § 109 in that at the time of the approval there were unresolved problems relating to (1) the foundation conditions at the bottom of the river at the bridge location, (2) the structural feasibility of the planned design of the bridge superstructure, and (3) the possible adverse effects to health of any increase in air pollution which might be caused by the bridge.

The Court does not believe that the problems which have developed regarding the condition of the river bed at the bridge site are such as would render Mr. Hall's approval of the preliminary construction plans violative of § 109. Before the construction of a bridge, it is necessary to make extensive investigations of subsurface conditions to determine if they are sufficient to support the foundations for the bridge piers. This is done primarily by means of borings "to determine the elevation * * * and the character of the base rock." (Tr. 602). At the time Mr. Hall approved the plans, specifications and estimates for the pier construction, these borings had not been completed, and subsequently problems developed so that the plans for the project had to be modified. (Tr. 603). But Mr. Hall emphasized that there is no question that the piers can be built to support the bridge as presently planned. (Tr. 603). He explained that preconstruction boring and other testing of the subsurface is not conclusive, and that it is only after the commencement of the actual excavation for the pier foundations that the engineers

can be certain that subsurface conditions are sufficient to support the piers. (Tr. 604). In view of the above, the Court concludes that the fact that Mr. Hall was not certain of the subsurface conditions at the time when he approved the plans for the construction of the piers does not render that approval inconsistent with the requirements of § 109.

■ Similarly, the Court is not convinced from the evidence in this case that the possible air pollutional effects of the bridge project represents a sufficient hazard to the health and safety of highway users to justify a finding by this Court that the defendants are required to undertake a study of such effects before the responsible official of the Department of Transportation may make the finding required by § 109 that the project is safe as planned.

A more serious problem is raised by the question of whether the bridge project as presently planned is structurally feasible. Structural feasibility, i. e., whether the planned bridge can be built so that it will stand up under normal use, is certainly an element which must be considered by the Division Engineer and by this Court in determining whether the § 109 requirement has been met. The bridge as presently planned will consist of abutments on the District and Virginia shores, with a span from each of these abutments to a pier located a short distance from each shore, and a long 750 foot span between the two piers. The bridge will be a prestressed concrete box girder structure, having the appearance of a flat arch. This design was among those developed by the consulting engineers in their Type, Size and Location Report prepared in 1967, (plaintiffs' exhibit 57) and has been approved by the Fine Arts Commission. (Plaintiffs' exhibit 54; Tr. 573). The bridge is of a type not previously used extensively in this country, and the 750 foot main span will make it the longest prestressed concrete bridge of its type in the world. (Plaintiffs' exhibit 69).

The evidence in this case indicates that the structural feasibility of the presently planned bridge was a matter of great concern among officials of the Federal Highway Administration prior to Mr. Hall's approval of the plans for pier construction in September, 1969, and that it remains an unresolved question. In September, 1968, Mr. Wilkes, the Chief Bridge Engineer of the Bureau of Public Roads, noted his concern with both the structural feasibility and the appearance of the proposed bridge design, and suggested that a comprehensive feasibility study and model testing be undertaken before a final commitment was made to the design.[56] Mr.

---

56. A memorandum from W. J. Wilkes to August Schofer, Regional Federal Highway Administrator, September 6, 1968 (plaintiffs' exhibit 69), includes the following statements:

The proposed prestressed concrete box girder bridge design with curvature on each end is a type of design and construction that has not been used extensively in this country. Several bridges of this type but of shorter main span length have been designed and constructed in European countries. A comprehensive feasibility study should be conducted which would take into account the effect of the curvature of the end spans and skew of the abutments. The study should be refined to a point where firm dimensions are established and required strength of the concrete determined.

\*　　\*　　\*　　\*　　\*

We are gravely concerned over the massive appearance of the bridge which is equivalent in height to a six-story building at the two river piers. The bridge is horizontally curved on each approach span so that the concave fascia girder must be warped in a third dimension. We strongly recommend that scale models of this bridge and adjoining structure be prepared and studied before final commitment is made for this type structure. As an absolute minimum, additional sketches should be prepared to show that the effect of the massive box girder bridge fore-shortened as viewed from each river bank and from the Key Bridge crossing. The proposed design violates many of the desirable principals of highway structure contained in the recent publication "The Freeway in the City."

Turner, the Federal Highway Administrator, testified that he concurs in these views. (Tr. 923). In late 1969, he requested additional feasibility studies and model testing by the District of Columbia Department of Highways and Traffic. (Tr. 605, 609–10). He has also sent a delegation of engineers to Europe to study bridges of similar types there. (Tr. 918).

Mr. Turner expressed his continuing concern in a memorandum to Mr. Schofer, the Regional Federal Highway Administrator, in March 1970 (plaintiffs' exhibit 113):

> In our memorandum of September 6, 1968, we requested that a comprehensive feasibility study be made for the proposed design which would take into account the effect of the curvature of the end spans and skew of the abutments. We are still concerned that the combination of the adverse geometry of the superstructure, the unconventional design details, the extreme lack of design experience of a structure of this type and the complete absence of this particular construction experience in this country make the undertaking *extremely hazardous and fraught with danger.* To the best of our knowledge, very little has been accomplished to alleviate this concern.

The 1968 Federal-Aid Highway Act directs the construction of certain projects within the District of Columbia including the Three Sisters Bridge, I–266 crossing of the Potomac River. Such construction was to be undertaken as soon as possible and "shall be carried out in accordance with all applicable provisions of Title 23 of the United States Code." Section 109 of Title 23, CFR, requires that

> The Secretary shall not approve plans and specifications for proposed projects on any Federal-aid system if they fail to provide for a facility (1) *that will adequately meet the existing and probable future traffic needs and conditions in a manner conducive to safety,*

> *durability and economy of maintenance;* (2) that will be designed and constructed in accordance with standards best suited to accomplish the foregoing objectives and to conform to the particular needs for each locality.

At the meeting in my office on March 20, 1970, an agreement was made with Mr. T. F. Airis, Director of the Department of Highways and Traffic, that a feasibility study would be initiated to determine the proper cross section design for the bridge. In addition to the design proposed by the District of Columbia, one or more of a conventional cross section would be included in the investigation. As a second phase of the investigation, it was agreed that a scale model of the section determined to provide the optimum of engineering and aesthetic properties would be constructed at a scale of about $\frac{1}{15}$ for the purpose of load testing in order to verify the various design assumptions that must be made by the designer. However, the model testing phase will not be started until this office is satisfied that the cross section to be tested will provide the safety, durability and economy of maintenance that is required by Section 109 of Title 23, CFR. (Emphasis supplied).

The view that the project is "extremely hazardous and fraught with danger" was reiterated by Mr. Hall himself in a letter dated April 2, 1970, to Mr. Airis, the Director of the District of Columbia Department of Highways and Traffic. (Plaintiffs' exhibit 114).

██ The Court has no reason to doubt the repeated assurances from various Department of Transportation officials that the bridge that will ultimately be built at the Three Sisters location will be a safe bridge. These officials emphasized that the Department does not build bridges which are not structurally feasible. (Tr. 613–14, 804, 920). But the issue before the Court is not whether the bridge that is *ultimately built* will be structurally sound, but whether the *pres-*

ent *plans* for the project were sufficient *to justify Mr. Hall's approval of the pier* construction in light of the § 109 requirement that the project provide for traffic needs "in a manner conducive to safety, durability and economy of maintenance." The Court concludes that Mr. Hall could not have made a rational finding that the bridge project *as presently planned* satisfies the § 109 requirement because of the uncertainty shared by several Federal Highway Administration officials, including Mr. Hall himself, as to the structural feasibility of the project as presently planned.

As discussed above, the District of Columbia Department of Highways and Traffic has been requested by the Federal Highway Administration to conduct feasibility tests and to prepare models of the proposed bridge for further testing. Until these tests are completed, it cannot be determined whether the presently planned bridge can be safely built. If these tests show that the present design is not structurally feasible, it will be necessary for a different type of bridge to be built. (Tr. 616). Therefore, the Court finds that it was unreasonable for the Division Engineer to approve the expenditure of public funds on the preliminary construction stages when he was uncertain that the project as planned would ever be completed. Mr. Hall himself stated that in his thirty-five years with the Bureau of Public Roads he had authorized construction to begin on a bridge before he was certain that the planned facility was structurally feasible on only one occasion. (Tr. 620).

 It is true that the plans, specifications and estimates which Mr. Hall approved in September, 1969, were only for construction of the piers of the bridge, and the approval form specifically provided that the "superstructure type [was] not yet determined." (Plaintiffs' exhibit 90). The plans, specifications and estimates for the superstructure have not yet been finalized, and it is in the process of their preparation that the feasibility tests are being carried on. But the Court feels that § 109 prohibits

the approval of the final plans and specifications and the commencement of construction for any integral part of a highway facility in a situation where the responsible officials have reservations as to the structural feasibility of the entire facility as planned. If § 109 is to be given any effect, it must be interpreted as prohibiting the approval of construction of such an integral part of a highway facility as the piers of a bridge at a time when the responsible officials are concerned that the planned facility is "extremely hazardous and fraught with danger."

The Court therefore holds that § 109 requires that, prior to approval of the plans and specifications for any integral part of a highway facility, the planning for that facility must have proceeded to a sufficient degree for the responsible officials to determine that the planned facility is structurally feasible. The Court further holds that the approval of the plans, specifications and estimates for the construction of the piers for the Three Sisters Bridge was not in compliance with the requirement of § 109. This approval is therefore set aside and the Division Engineer is enjoined from approving the plans and specifications for any part of the bridge facility until the responsible officials are convinced that the entire facility as planned is structurally feasible, and will therefore serve the transportation needs of the area "in a manner conducive to safety, durability and economy of maintenance."

### 23 U.S.C. § 134

This section provides as follows:

It is declared to be in the national interest to encourage and promote the development of transportation systems, embracing various modes of transport in a manner that will serve the States and local communities efficiently and effectively. To accomplish this objective the Secretary shall cooperate with the States, as authorized in this title, in the development of long-range highway plans and programs which are properly coordinated with plans for

improvements in other affected forms of transportation and which are formulated with due consideration to their probable effect on the future development of urban areas of more than fifty thousand population. After July 1, 1965, the Secretary shall not approve under section 105 of this title any program for projects in any urban area of more than fifty thousand population unless he finds that such projects are based on a continuing comprehensive transportation planning process carried on cooperatively by States and local communities in conformance with the objectives stated in this section.

The crucial finding required by this section, i. e., that the proposed project is "based on a continuing comprehensive transportation planning process carried on cooperatively by states and local communities," has been delegated by the Secretary of Transportation to the Bureau of Public Roads' Division Engineer, in this case Mr. Hall. Mr. Hall testified that he made the required finding in August or September, 1969, as part of his decision to authorize the commencement of construction of the piers for the bridge. (Tr. 1107). The finding was not committed to writing but Mr. Hall testified that he did discuss it with his staff. (Tr. 1109–10). The finding was based on the approval and continuing review of the Three Sisters Bridge project by the Transportation Planning Board (TPB) of the Metropolitan Washington Council of Governments (COG). (Tr. 1108).

The plaintiffs contend that the Division Engineer's finding is arbitrary and capricious in that it is not supported by the actual status of transportation planning in the Washington metropolitan area. The basis of the plaintiffs' argument is that the comprehensive transportation plan promulgated by the National Capital Planning Commission (NCPC) in December, 1968, specifically "rejects the Three Sisters Bridge * * as being both unnecessary and undesirable." (Plaintiffs' exhibit 71, p. 19). The plaintiffs argue that since this is the only actual transportation plan which has been published for the Washington area, it cannot be reasonably said that the Three Sisters Bridge is "based on a continuing comprehensive transportation planning process."

The COG is an organization created by the District of Columbia, and several of the local jurisdictions in Maryland and Virginia in the metropolitan area to provide for area wide approaches to common problems. The TPB is the transportation planning arm of the COG. The TPB has never published a transportation plan for the area as such, and it is currently in the process of preparing such a plan. (Tr. 1311). But it has reviewed the transportation needs of the area and proposals for new facilities to satisfy those needs since its inception. (Tr. 1312–13). In December, 1967, the TPB formally approved the Three Sisters Bridge as "consistent with comprehensive planning in the region." (Defendants' exhibit 11).[57] There is evidence that the TPB has continuously reviewed the transportation system for the area and that the approval of the Three Sisters Bridge has never been rescinded. (Tr. 1283).

Mr. Hall testified that he regarded the NCPC plan as relevant to his finding under § 134, (Tr. 496) but he did not feel that the fact that the plan did not include the Three Sisters Bridge negated his finding in that he regarded the TPB to be the primary agency to which he should look in making his finding. He based this conclusion on the fact that § 134 calls for cooperative planning on a region wide basis and the fact that the NCPC is concerned with planning solely for the Dis-

57. It is true that this approval was in response to a submission of the project for approval under the Demonstration Cities and Metropolitan Development Act of 1966. [42 U.S.C. § 3334 (Supp. V, 1970)]. But there is no requirement in § 134 that a project be given specific formal approval under that section by any group. The project must merely be based on the transportation planning process for the area.

trict of Columbia, while the TPB is a regional organization.

 The Court concludes that the finding of the Division Engineer that the bridge project is "based on a continuing comprehensive transportation planning process carried on cooperatively by States and local communities" was reasonable and was supported by the status of transportation planning for the Washington metropolitan area. The Court finds that, while the transportation planning activities of the NCPC are certainly relevant to the status of the transportation planning process for the metropolitan area, the primary planning unit for the cooperative planning called for in § 134 is the TPB. The NCPC has statutory responsibilities only as to the District of Columbia itself. D.C.Code § 1–1001 et seq. The TPB, on the other hand, has been established to provide area wide transportation planning. The Board of Commissioners of the District of Columbia, on June 17, 1965, passed a resolution providing for the District's participation in the continuing comprehensive planning process for the national capital region, which would be carried on by the TPB. (Defendants' exhibit 12). The resolution makes specific reference to the requirement for such planning in § 134. The Court therefore concludes that the District government itself has recognized that it is the TPB, and not the NCPC, which is the planning body primarily responsible for the planning process called for in § 134.

The fact that the TPB has not yet completed a comprehensive transportation plan for the area does not mean that its planning activities cannot constitute the proper basis for the § 134 finding. The statute provides only that the project must be "based on a continuing comprehensive transportation planning *process*." The Court finds that the approval of the Three Sisters Bridge by the TPB in 1967 and the continuing review of the transportation needs of the area constitutes such a "process," and the statute does not require that the planning process have resulted in a published comprehensive plan in order to constitute the basis for approval of a project under § 134.

### *23 U.S.C. § 103*

 The plaintiffs' claim of noncompliance with § 103 is based not on the statute itself, but on the implementing regulations. The regulations [58] provide that all proposals for revisions of the Interstate System should be made by the "State highway department." The term "State highway department" is defined by 23 U.S.C. § 101 as "that department, commission, board, or official of any State charged by its laws with the responsibility for highway construction." The request that the Three Sisters Bridge be redesignated as part of the Interstate System was made in a letter, dated August 12, 1969, from Mr. Airis, the Director of the District of Columbia Department of Highways and Traffic, to the Federal Highway Administrator, Mr. Turner. (Plaintiffs' exhibit 80). It was on the basis of this letter, that Mr. Turner proceeded on August 13, 1969, to restore the Three Sisters Bridge to the Interstate System. (Tr. 891).

The plaintiffs contend that under Title 7 of the D.C.Code it is the Mayor-Commissioner of the District of Columbia who has responsibility for highway construction. Since Mayor Washington made the request which led to deletion of the Three Sisters Bridge from the Interstate System in January, 1969, but has never made a request that it be redesignated as part of the System, the plaintiffs argue that the redesignation of the bridge to the System in August, 1969, violates the regulations implementing § 103.

The uncontradicted evidence is that Mr. Airis wrote the letter of August 12, 1969, to Mr. Turner, not merely on the basis of the vote of the City Council approving the bridge project, but at the direction of the Mayor. (Tr. 1026–27, 1393). The Court concludes that Mr.

58. 23 C.F.R., Part 1, § 1.6(a), (b) (1970).

Airis' action constitutes substantial compliance with the requirements of the statute and the regulations. The plaintiffs' argument is based on too technical an interpretation of the requirements of the statute. Although the Mayor may technically be the official with whom proposals for alteration of the Interstate System for the District of Columbia must originate, the Court finds it reasonable that the actual request be made by the official in the District government most directly involved in highway construction so long as he is acting at the direction of the Mayor. Therefore the Court finds that there has been no showing of noncompliance with § 103 or the implementing regulations.

### 23 U.S.C. § 317

This section provides in pertinent part as follows:

(a) If the Secretary determines that any part of the lands or interest in lands owned by the United States is reasonably necessary for the right-of-way of any highway, or as a source of materials for the construction or maintenance of any such highway adjacent to such lands or interests in lands, the Secretary shall file with the Secretary of the Department supervising the administration of such lands or interests in lands a map showing the portion of such lands or interests in lands which it is desired to appropriate.

(b) If within a period of four months after such filing, the Secretary of such Department shall not have certified to the Secretary that the proposed appropriation of such land or material is contrary to the public interest or inconsistent with the purposes for which such land or materials have been reserved, or shall have agreed to the appropriation and transfer under conditions which he deems necessary for the adequate protection and utilization of the reserve, then such land and materials may be appropriated and transferred to the State highway department, or its nominee, for such purposes and subject to the conditions so specified.

As discussed in connection with § 138, the Three Sisters Bridge project will involve the use of federal parklands on both the Virginia and the District of Columbia shores of the Potomac. This land is under the jurisdiction of the National Park Service of the Department of Interior. The defendants have admitted in their answer that the map called for by § 317 has not been filed with the Secretary of Interior.

The defendants contend that the filing of the map called for in § 317 is not an absolute prerequisite to the construction of the bridge. They argue that it would be a useless formality in this case in that the National Park Service has been advised of plans for the bridge and has approved the use of the parklands involved. The plaintiffs rely on the mandatory language of the statute that the Secretary "*shall* file" the map and argue that the filing of the map is a required condition precedent for construction of the bridge.

The National Park Service first gave its approval of the Three Sisters Bridge project in an agreement with respect to the overall freeway program in the Washington area entered into with the District of Columbia and Virginia in 1966. (Defendants' exhibit 19). In August, 1969, after the bridge had been redesignated as part of the Interstate System, the Park Service issued permits for the use of the parkland on the District shore, (defendants' exhibit 16) and this was supplemented on October 1, 1969, with permission for the use of the parkland on the Virginia shore. (Defendants' exhibit 18).

In view of the long planning history of this project, and the approval by the National Park Service of the use of the parklands involved, the Court finds that there has been compliance with the spirit, if not the letter, of § 317. The purpose of § 317 was outlined in United States v. 10.69 Acres of Land, Etc., 425 F.2d 317, 319 (9th Cir. 1970):

The reason [for the map requirement of § 317] seems plain. When

property sought for highway purposes is owned by third persons, no conflicting governmental use is likely to be involved. When the property is already owned by the United States, however, the possibility of a potentially conflicting governmental use is substantial. For this reason sections 107 (d) and 317 require the Secretary of Transportation to give notice of the proposed appropriation for highway purposes to the Secretary of the Department having control of the land, and provide a means by which the latter may protect any governmental interest in use of the property for purposes other than highway construction.

The Court finds that the consultation between the District of Columbia and the Department of Transportation and the National Park Service fulfills the purpose of § 317, i. e., the affording of the governmental agency having jurisdiction over the land the opportunity to protect any nonhighway governmental interest in the land. Therefore the Court finds that strict compliance with the map filing requirement of § 317 is not a necessary condition precedent to construction in this case.

## CONCLUSION

Having held the evidentiary hearing called for by the Court of Appeals, the Court finds that in planning and commencing construction of the Three Sisters Bridge, the defendants have not complied with 23 U.S.C. § 128 and the Department of Transportation Policy and Procedure Memorandum 20–8 promulgated pursuant thereto, and 23 U.S.C. § 109. Therefore the construction work on the project must be enjoined until there has been compliance with these sections of the statute and the Policy and Procedure Memorandum. The Court finds that there has been compliance with the other provisions of Title 23 of the United States Code which have been raised in this action.

The foregoing opinion shall constitute the findings of fact and conclusions of law. Counsel will submit an appropriate order within five days.